THE PEOPLE OF THE STATE OF NEW YORK ex rel. UNION BAG AND PAPER CORPORATION, Relator, *v.* JOHN A. FITZGERALD, as Mayor, AUGUSTUS CARPENTER and Others, as Trustees, and JOHN T. ETU, as Clerk of the Village of Hudson Falls, Washington County, New York, Respondents.

Supreme Court, Washington County, August 19, 1937.

*Lindsay Goeltz* and *Leroy E. Middleworth,* for the relator.
*Edward R. Waite,* for the respondents.

ROGERS, J. I think the assessment should be confirmed. The assessors showed remarkably good judgment in arriving at a sum that is fair to both the company and the village. While the amount assessed against the twenty-one properties in dispute is about double the value, as given by the relator's tax expert, it is about one-half that given by the disinterested State appraiser and about one-third of that given by the village expert witnesses.

Village assessors are selected from the village residents. Usually, they are not experts in determining the valuation of large industrial plants. They do have, however, some experience in the general real estate values of their visionage. The very nature of their work requires them to discuss with others and to make comparisons of real estate values throughout their bailiwick. Their sources of information are not limited by such legal proof as is received at a trial. They are free to consider hearsay evidence and many angles that are not taken into consideration by experts, who merely calculate, on a unit cost basis, the brick and mortar, floor space, material and labor, etc., which go into the cost of construction.

"In certiorari proceedings to review taxation assessments, it is presumed that the assessments are correct, and that the assessors did their duty. The burden is on the relator to 'make it conclusively appear that the method by which the assessors arrived at the result complained of was incorrect, and that the assessment does not represent the fair value of the property assessed.'" (*People ex rel. Lehigh Valley R. Co.* v. *Burke*, 221 App. Div. 248, 251; *People ex rel. Jamaica W. S. Co.* v. *Tax Comrs.*, 196 N. Y. 39.)

The following quotation is taken from the opinion of Justice VAN KIRK in *People ex rel. Haile* v. *Brundage* (195 App. Div. 745): "The determination of the assessors will not be disturbed, unless it clearly appears that injustice has been done the relator, and that the assessment does not represent the fair value of the property assessed. * * * If the evidence leaves the matter in doubt, it is the province of the assessors to determine the value and the amount of property liable to taxation. (*People ex rel. Osgood* v. *Comrs.*, 99 N. Y. 154; *People ex rel. B. E. M. Co.* v. *Wemple*, 129 id. 543, 558; *People ex rel. P. R. R. Co.* v. *Comrs. of Taxes*, 104 id. 240; *People ex rel. R., W. & O. R. R. Co.* v. *Haupt*, Id. 377, 381.) In *People ex rel. R., W. & O. R. R. Co.* v. *Haupt* (104 N. Y. 377, 381) the court, after speaking of the conflicting evidence as to value and the opinions of experts said: '*Back of all that remained the observation and judgment of the assessors.*' Courts are not called upon to draw over-fine distinctions. Assessors generally are not experts on values; and the value of property often involves elements of uncertainty. The best experts vary widely in estimating values

of property. The assessors, in seeking information and determining the amount of an assessment, are not limited to the rules of evidence prevailing in courts; they acquire information from observation, from hearsay, from inquiries and from the opinions of others."

The valuation of the properties for tax purposes, according to the credible proof in this case, would justify a higher assessment. The assessors undoubtedly considered that the relator was, in a large way, the meal ticket of the village and should be shown as much liberality as fairness to the other taxpayers could permit. The assessors have sensed the situation to a nicety. They apparently appreciated that it would not be for the general welfare of the village to antagonize the largest employer of labor (and in many other ways the most beneficial institution that we have in the village) by sticking on the last dollar in assessment. They have, in their effort to be fair to all concerned, fixed the valuation midway between the low and high points of valuation.

I was not favorably impressed with the relator's professional tax expert. He is an officer of the company named — The National Bureau of Property Administration. He lives in Chicago and operates in many States. He spends a large part of his time in testifying as to tax matters. He has never been extensively engaged in contracting and building and has done nothing in that line for some years. His occupation is to make appraisals for industrial corporations and furnish the proof upon which to base assessment reduction proceedings. Solicitous experts of this type sometimes stir up trouble and engender ill feeling between companies and municipalities over taxation, when it would not otherwise exist. He lacks the experience of the experts sworn in behalf of the village in the actual construction of mills, factories and other large buildings in this locality. If, however, the opinions of the experts employed by the village are influenced to obtain for the village as good a result as possible by the fact they are being paid for their services, and if, therefore, the testimony of the paid experts on both sides were laid aside and the testimony of the disinterested expert employed by the State is solely considered, his valuation is found to be twice the amount of the assessment. It is the duty of this expert from the State Tax Department to go all over the State to ascertain that manufacturing plants are fairly assessed. He made a very careful inspection of the properties involved here before this litigation was begun and afterwards he made a second inspection for the purpose of checking his figures. His unit of construction cost is twenty-eight to thirty-two cents as against the unit of fifteen cents given by the relator's expert. The

unit of cost given by the village experts varies from thirty-five to forty-five cents. It seems hardly possible that the disinterested State expert and the three village experts should all be more than doubly wrong and the relator's expert alone correct.

It is undisputed that the relator is not only a going, but a prosperous concern. Some evidence was adduced relating to the relator's earnings at the Hudson Falls plant. This evidence was most inconclusive. The company operates plants in other sections of the country and has a general office in New York city. From the local plant's gross earnings large sums were deducted in 1936 for the New York city office and other overhead expenses. Such charges against the gross earnings of the local plant were in accordance with the policy and within the discretion of the company's governing board. Whether they have been fairly allocated, so as to make a just showing of the local plant's earnings, has not been shown and, in any event, is wholly immaterial as bearing upon the assessment.

The Court of Appeals in *People ex rel. D., L. & W. R. R. Co.* v. *Clapp* (152 N. Y. 490, at p. 495) said: " The principle of assessing a few miles of railroad in a town according to the relations which it is supposed to bear to the whole of a vast and intricate system, or to the income or earning power of the entire system, draws into the calculation so many elements that the process becomes too complex and difficult for even an expert. It is no disparagement of the capacity and intelligence of the average assessor to say that it would present to him a problem incapable of accurate solution and a rule of action in the performance of his official duty impossible in practice."

The court also said (at p. 493): " The earnings of a railroad include the earnings of the personal property as well as the real estate. It includes the use of its franchises, and the profits of operation may, in many cases, be attributed to the skill or ability of the management. The rentals grow out of all real and personal estate and franchises. It is simply impossible to apportion the rentals or earnings and credit the just proportion to real estate, to personal property and to franchises."

It was, therefore, the duty of the assessors to appraise the relator's lands and buildings as they found them, giving no consideration whatever to the question of the profit or loss made in any particular plant, mill or building.

Property value is the goal of assessors. Every person should pay his just share of taxes and it should be measured in accordance with the value of his property. Where the form is of a general type, such as a residence, or store building in a village, the market

value is the simple and correct method of obtaining the assessment valuation. Where, as here, the property consists of a paper mill, bag factory, storehouses, yard equipment, etc., there is no market value, and neither party has attempted to offer any evidence as to the market value of the relator's property. In such case, if the property is being used by a going concern, the proper rule of assessment is reconstruction cost less depreciation. The State expert allowed seventy per cent for physical depreciation; the village experts sixty-seven per cent, and the relator's expert allowed only fifty-one per cent. Thus the testimony of the village experts regarding this item is more favorable to the company than that of its own expert.

Physical depreciation is the reduction in value of a structure due to actual wear and tear, or physical deterioration. Each year companies are wont to charge off substantial amounts for physical depreciation, but, as a matter of fact, if a company keeps its plant, by the expenditure of substantial sums, in a fine state of upkeep, the actual deterioration is slight. Such depreciation is usually calculated by experts in accordance with the estimated life of the structure, which is much to the advantage of the owner if he has kept the structure in a high state of repair. The relator's properties are in good repair.

Obsolescence, which is one form of depreciation, affects value and should be given due consideration by assessors. " The word [depreciation] means, by derivation and common usage, ' a fall in value; reduction of worth.' " (*N. Y. Life Ins. Co.* v. *Anderson,* 263 Fed. 527, at p. 529.) It includes obsolescence. (*Nashville, C. & St. L. R. Co.* v. *United States,* 269 Fed. 351, at p. 355; *San Francisco & P. S. S. Co.* v. *Scott,* 253 id. 854, at p. 855.)

Our Court of Appeals in *McAnarney* v. *Newark Fire Ins. Co.* (247 N. Y. 176), dealing with the question of the actual value of a brewery destroyed by fire during the prohibition period, held: " An obsolete thing is a thing no longer in use. In determining the extent to which these buildings had suffered from depreciation the trier of fact should have been permitted to consider that, owing to the passage of the National Prohibition Act, they were no longer useful for the purposes to serve which they were erected. It should have been permitted to consider their adaptability or inadaptability *to other commercial purposes.*"

The relator claims obsolescence here because its plant is out of date and not as adaptable for paper and bag making as a modern mill would be, and secondly, because craft paper can be made more cheaply in the South where the raw material is available.

The proof is that the buildings in question were in daily use for the manufacture of paper and bags. The relator's local superintendent testified that a new building could be erected which would house all of the relator's operations under one roof and permit more efficient operation. His estimate of the cost of such building was rather indefinite. He had made no detailed plans or estimates. If the same site were used it would mean the demolition of the present structures and, therefore, their present value would have to be added to the cost of construction of the new building. If another site with railroad facilities were procured, its cost (of which there is no evidence) should be added to the cost of the new mill. His testimony impressed me as rather speculative. It does not appear to be a practical proposition that the present structures be torn down or abandoned in order to build a new mill (thus sacrificing their present value), if, as contended by the relator, the trend of the paper-making industry is to the South.

Moreover, there is no proof whatever that the present structures are not usable for other purposes than paper and bag making. The new bag factory, so called, is a relatively modern building with a large area of floor space. It must be that it would be adaptable for some other industry, and the same is true, to a lesser extent, of the other structures. In order to have an assessment reduced thereon, it is not sufficient to show merely that a building is unsuited except for the purpose for which it is constructed. It must be shown, also, that it has no usable value. This rule is well exemplified in the so-called *Stock Exchange* and *Mechanicville Bank* cases (*People ex rel. N. Y. Stock Exchange B. Co.* v. *Cantor*, 221 App. Div. 193; affd., 248 N. Y. 553; *People ex rel. Rickey* v. *Hunt*, 241 App. Div. 261).

In the *Stock Exchange* case the building cost $3,250,000. The relator claimed this building did not add anything to the value of the land for tax purposes, because it had no market value, and was not usable for any purpose other than as a stock exchange. The court held:

" A complete answer to this contention, however, is that section 6 of the Tax Law * * * provides: ' All real and personal property subject to taxation shall be assessed at the full value thereof * * *.

" It seems to me that if the building is of such a character that it cannot be sold except under extraordinary circumstances, it is still the duty of the Deputy Tax Commissioner in the first instance in ascertaining the value of the property and of the Commissioners of Taxes in imposing the assessment, to determine its actual value from such material as the circumstances of the case afford. * * *

The same principles were likewise applied by the court in other cases, namely, *People ex rel. Union Club* v. *O'Donnell* (126 App. Div. 916), where the cost was resorted to in order to fix the full value, it appearing that the club building had small commercial value, * * *. In such a case the market value would be difficult, if not impossible, to find, *and yet the property is not permitted for this reason to escape taxation.*"

Our Appellate Division in the *Mechanicville Bank* case (where the bank was in the hands of a receiver and it was contended that, therefore, the bank building having no usable value except for bank purposes, the assessment should be reduced) held, on the authority of the *Stock Exchange* case, as follows: " The fact that the bank building can only be used for that purpose does not justify a reduction."

It seems to me that a structure *might* exist (built, but no longer used, for a very special purpose) which had no other possible usable purpose. In such case the structure would add no value to the land upon which it stood, and the value of the land alone should be assessed, but, as stated before, that is not the situation in the case here. There is no evidence whatever that the relator's mills and factories cannot be used for other purposes. The relator has the burden of proof. It must prove the assessment is wrong. Inasmuch as the relator has failed to show anything to the contrary, it must be assumed that the buildings are usable for other purposes.

The relator also contends for obsolescence due to what it terms in its brief, " loss of utility of a plant due to economic changes." As long as the mills and factories are actually used for the manufacture of paper and bags, this economic inutility could not properly be considered by the assessors. It is true that the craft paper industry is rapidly moving into the Southern States. Without doubt, craft paper can be manufactured there cheaper where the raw materials are at hand. If it appeared that the buildings in question could not be used for any other manufacturing purpose, then, as in the *Brewery* case (*McAnarney* v. *Newark Fire Ins. Co.*), above referred to, there might be some point in the relator's contention. The evidence in this case, however, is just to the contrary. It appears that all of the so-called " specialty " bags, of which the relator makes a great quantity, are manufactured from paper made from spruce pulp, which is not available in the South. The relator owns a large paper mill at Fenimore, Saratoga county, just across the river from the properties here involved, that produces spruce pulp paper which the relator uses for its specialty bags. Since the supply of spruce is from the North, there would be no purpose in manufacturing paper made from the spruce pulp in the far South.

The village has stoutly maintained that the whole proceeding must fall because the petition and writ are defective in that they fail to show, as required by law, the amount the company claims it is overassessed as to each of the twenty-one parcels of real estate, citing *People ex rel. Ward* v. *Sutton* (230 N. Y. 339) where it is held: " The validity of one assessment is independent of the validity of the other."

Each of these properties involved in this proceeding was separately assessed by the assessors. (*People ex rel. City of New York* v. *Keeler*, 237 N. Y. 332.)

In view of the foregoing views as to the merits, I do not deem it necessary to pass upon this technical point.

The village also insists that even if there were overvaluation it is no ground for vacating or reducing the assessment, because it does not appear that such overvaluation has resulted in prejudice to the relator, citing *People ex rel. Rickey* v. *Hunt* (241 App. Div. 261). In that case the opinion reads: " However, there is a more compelling reason for the dismissal of these writs. By virtue of the stipulation of respondent's counsel his client has no grievance to be redressed. He concedes that the assessments are equal and proportionate with all other assessments in the city. Therefore, his client is not aggrieved. The question of illegality is out of the case. Under section 290 of the Tax Law the respondent must establish three propositions: (1) That there is in fact an overvaluation; (2) that he is aggrieved thereby; (3) the extent of the injury. Even if it be assumed that respondent has shown a mere overvaluation, that is not sufficient to entitle him to relief. He must also show that he is aggrieved by the assessment and the extent of the injury. If respondent's assessments are reduced here, obviously all other assessments in the city will be unequal and disproportionate to those of the respondent, and consequently he will pay less than his just share of the taxes. Overvaluation is no ground for vacating the assessment. (*People ex rel. Powell* v. *Supervisors*, 54 Misc. 323.) It is only those who are prejudicially affected by errors committed in the assessment of property who have a right to a review thereof, and, in the absence of any showing of prejudice resulting from the assessment, a person has no such right and hence cannot complain of a failure to create any proper board for the purpose of reviewing assessments. (61 C. J. 783.) "

The relator, in its petition and writ, claimed inequality as well as overvaluation in its assessment. The parties were unable to agree as to the parcels of real estate for the purpose of comparison with the relator's properties, as to the extent of their full value assessments. On their application the court, pursuant to the Tax

Law, selected for such purpose three industrial properties, five business properties and twelve residences. Each party, in accordance with the statute, filed with the court the appraised valuation of these properties as fixed by its witnesses. But, at the opening of the trial relator's counsel stated: " We have alleged both overvaluation and inequality in our petition. We have decided at this hearing to depend entirely upon overvaluation of our properties." The village claims that, inasmuch as the question of inequality was thus eliminated by the relator, the overvaluation of its properties, even if established, would not entitle it to relief; that there would also have to be some showing that every other property in the village was not overvalued to the same extent; that the statute, permitting the review of assessments, is designed to redress grievances, and, therefore, there must be a substantial showing of grievance before an assessment may be changed.

I feel, if the relator had established that the full value of its property assessed was substantially less than the assessment, that it could be considered aggrieved, for section 21 of article 2 of the Tax Law does not require more than that real estate shall be assessed at its full value. (*People ex rel. Merchants' Real Estate Co.* v. *Wells*, 110 App. Div. 194; *People ex rel. N. E. Tel. Co.* v. *Woodbury*, 63 Misc. 1.) The assessors must verify the tax roll and swear that the real estate has been estimated at " the full value thereof." (Tax Law, § 28.) Simply because the assessors overvalued one piece of property does not necessarily mean that they disobeyed the statute and placed an overvaluation on each and every piece of property in the tax district. Rather, it should be assumed that the assessors did not go beyond their authority and assess the other properties in amounts above their full value.

It is a matter of common knowledge that assessments outside of cities are usually fixed at less than their full value. In some towns assessments are on a basis of fifty or sixty per cent, and in others on a basis of seventy or eighty per cent of their full value. Therefore, arises the necessity for equalization by the board of supervisors.

Inequality usually arises where assessments are made upon the basis of a percentage of full value. In such case the doctrine of the *Mechanicville Bank* case would be applicable. Where, however, an assessment is made for more than full value and there is nothing to show at what percentage of value the other assessments in the tax district were made, I think it must be assumed that, in respect to them, the assessors did not violate the statute and assess them at more than their full value. Therefore, it follows that if the relator had sustained by proof its allegation that its properties were assessed for more than their full value, there being no proof

that the other properties were assessed at more than full value, it would be aggrieved and entitled to redress. In the *Mechanicville Bank* case it will be noted that the concession of the relator's counsel went so far as to admit that all the assessments in the city were equal. Here there is no similar admission.

The writ should be quashed and the assessments confirmed, with costs.