No. 45,270

GARVEY GRAIN, INC. *Appellant,* v. KING R. MACDONALD, County Assessor of Sedgwick County, Kansas, *et al., Appellees.*

SAM P. WALLINGFORD, INC., *Appellant,* v. MARIE WARDEN, County Treasurer of Sedgwick County, Kansas, *et al., Appellees.*

(453 P. 2d 59)

Opinion filed April 8, 1969.

*Gerald T. Aaron,* of Wichita argued the cause, and *William D. Watts,* of Wichita, was with him on the brief for appellant Garvey Grain, Inc.

*William C. Farmer,* of Wichita, argued the cause, and *Paul V. Smith, Douglas E. Shay, Leo R. Wetta, James R. Schaefer, Thomas A. Wood* and *Larry L. Witherspoon,* of Wichita, were with him on the brief for appellant Sam P. Wallingford, Inc.

*George D. McCarthy,* of Wichita, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

FATZER, J.: These three actions were filed pursuant to K. S. A. 79-2005 to recover taxes levied in 1964 upon grain elevators located in Sedgwick County and paid by the appellants under protest. The actions were ordered consolidated and trial was by the district court. Except for the names of the plaintiffs, the amounts of taxes involved, the date of payment, the bushel storage capacity, and various exhibits computing taxes based on the 1964 assessments sought to be recovered, the evidence was equally applicable to each plaintiff. The appeals are from the order of the district court rendering judgment against the taxpayers.

The parties stipulated that the decision of this court in one case will determine the decision in the other two cases, and since the points of law involved are identical, it is deemed unnecessary to summarize the evidence in each case, hence, the following pertains to the appellant, Sam P. Wallingford, Inc.

On December 21, 1964, the appellant paid 1964 taxes to the county treasurer of Sedgwick County, $28,351.10 of such taxes being paid under protest. The written protest contained citations of law, statutes and facts relied upon, and clearly stated it was made upon grounds that the 1964 taxes were the result of levies extended against valuations and assessments of the appellant's property which were so unreasonable, excessive, arbitrary, oppressive, illegal and grossly discriminatory as to be void and constituted constructive fraud on the rights of the taxpayer in violation of Chapter 460, Laws of 1963, Section 1 of Article 11 of the Constitution of Kansas, and the Fourteenth Amendment to the Constitution of the United States.

The appellant timely commenced this action, and its amended petition incorporated the written protest and alleged that all conditions precedent to the bringing of the action had been performed; that the valuation of the taxpayer's property had been fixed at more than the statutory mandate of 30 percent of its true value and at a greater percentage of its true value than the valuation of other comparable properties to which the same tax levies were applicable, and that the valuation and assessment of its property upon which

the 1964 taxes were levied was illegal and void for the reason that in determining the justifiable value in money of such property, as required by K. S. A. 79-501, the assessor ignored obvious facts and failed to give consideration to and apply the factors or combinations thereof prescribed by the Legislature in K. S. A. 79-503. The petition further alleged that the illegal and grossly discriminatory valuation placed upon the appellant's property in 1964 was $843,000; that 30 percent of the justifiable value in money of such property was $500,000, and that the tax which would be due on the difference between such valuations was $28,351.10, for which recovery was sought.

As preliminary, it may be said this controversy revolves around the "Roberts Schedule" promulgated by the Director of Property Valuation for the assessment of bondable grain elevators located in the state. The schedule was prepared in 1960 by Francis R. Roberts, the field director of that department, but was not used in Sedgwick County until 1964. There was no change in the schedule from the time it was formulated until applied in 1964, and with minor exception not here material, it was used and strictly adhered to by the firm of Cole-Layer-Trumble, employed by the county assessor, to assess the appellant's and other taxpayers' property in 1964.

In formulating the schedule, Roberts wrote a number of suppliers of materials and builders of grain elevators and obtained costs of building elevators, and he devised the schedule on a cost less depreciation basis, and nothing else. Except for the cost of reproduction factor, the schedule did not provide for any adjustment with respect to the economic condition of the grain storage industry, such as obsolescence or functional depreciation, nor did it recognize or make provision for the consideration of any other pertinent factors set forth in 79-503, to determine justifiable value. It merely directed county assessors to determine justifiable value by bushel storage capacity times the scheduled cost, less one percent per annum depreciation according to the age of the elevator and did not permit depreciation below 40 percent of original cost. Moreover, as demonstrated by the provisions of the schedule, there was no way to determine the effect of average annual occupancy on fair market value although occupancy is a determining factor of revenue and is one of the more important factors that a prudent purchaser

would look at in determining whether he would buy an elevator. Likewise, there was no way to attribute valuation to location although location affects transit privileges and the Wichita elevators are at a disadvantage compared with those, for example, at Newton and Hutchinson. A prudent purchaser would take this location factor into consideration, since location affects freight rates and therefore affects profits.

A summary of the facts contained in the pleadings, the admissions of the parties, and pertinent evidence introduced by the appellants, which was uncontradicted except as hereafter noted, follows:

The Wallingford elevators are federally licensed and bonded elevators of a capacity of 12,585,000 bushels, located on 35 acres of land. There are approximately 8½ million bushels of upright concrete storage and the balance is lean-to sheds. Battery F of the elevator was built in 1929, Battery H was constructed in 1949, and the last unit was built in 1958. Photographs showed cracking and breaking out of the concrete in the concrete tanks.

When Roberts devised the assessment schedule, the storage capacity of appellant's elevators, as well as elevators of other operators similarly situated, was virtually 100 percent full. Those operators had experienced a number of good years during which capacity was quite full and taxing authorities in many counties had the assessment of their properties up "pretty high." However, no one was paying attention to the Roberts schedule because it was not being used.

In 1962 or thereabouts, as a result of the change in the farm program from actually storing grain in elevators to the soil bank program, and considerations affecting the supply of world and domestic small grain needs, the United States Department of Agriculture began shipping grain stored in elevators to gulf and west coast ports, which resulted in a steady decline in grain storage occupancy. As a result of those governmental policies, the history of appellant's average annual occupancy was as follows: 1962, 81.1 percent; 1963, 59.5 percent; 1964, 43 percent; 1965, 35.3 percent, and 1966, 20.38 percent. As indicated, occupancy has an important bearing on the fair market value of an elevator, and the appellant and other operators knew that income was not only on the decline, but they could see it would decline faster. In 1964, the grain storage industry realized it could no longer pay a luxury tax since the occu-

pancy problem was common to all elevators, and the Roberts schedule made no provision for functional or economic obsolescence in that respect.

In November 1963, the Cole firm made a bushel capacity measurement of appellant's elevators but no effort was made to determine values at that time. Sometime in March, 1964, the Cole firm actually applied the Roberts schedule to the capacity measurements taken in November 1963, which was merely a mathematical calculation by multiplying capacity measurements by the scheduled cost less depreciation of one percent per annum according to the age of the elevator. However, at that time notices had not been sent out by the county assessor giving the appellant its assessed valuation. All the appellant had was the work sheet prepared by the Cole firm and it had not been notified of a tax change other than it knew perhaps such a change was in the wind. Upon receipt of the Cole firm's work sheet, the appellant went to see the county assessor to seek relief from the proposed assessment of its property and was told he did not make the assessment, but that the Cole firm did. When the Cole firm was contacted, the appellant was told it really did not make the assessment other than to mathematically apply the Roberts schedule, and that the appellant should talk to Roberts.

On April 10, 1964, the appellant and other grain operators in Sedgwick County met with Roberts, the Cole firm, and the county assessor in his office in Wichita. Roberts was told the schedule did not yield a valuation that was in line with the changed conditions in the grain storage industry because it did not permit adjustment by the assessor for economic obsolescence or the effect of location on value. Roberts readily admitted the schedule was a cost less depreciation schedule and stated he knew that conditions had changed in the industry and that the schedule needed to be revised to provide an economic functional depreciation factor. When asked if the schedule could be changed to make that adjustment for the 1964 assessment, Roberts said, "no, that it was too late to change it"; "that he had sent copies of it to some of the county clerks earlier than this April 10th meeting, and he didn't want to go back to them again with a revised schedule," and that "[t]his is the schedule, and we have required the Cole-Layer-Trumble firm to use it." As indicated, when the Roberts schedule was prepared the appellant was operating at almost 100 percent capacity, and in January, 1964, the elevator was less than half full. Roberts

stated he would add an economic functional depreciation factor for the 1965 assessment, and suggested the industry appoint a committee to meet with him later in 1964.

In August, 1964, a committee of the Kansas Grain and Feed Dealers Association met with Roberts and representatives of the County Clerks Association in Topeka to work out an economic functional depreciation factor to be incorporated in the 1965 assessment schedule. Representatives of the grain industry asked Roberts to give them an economic factor which could be applied and which would produce a more realistic assessment value. Roberts stated he realized the Property Valuation Department had a sick industry on its hands and he wanted to work with the committee. Various statutory factors were discussed such as depreciation and location, but the problem most common to all firms was occupancy.

As a result of that meeting, Roberts and the Property Valuation Department agreed to and did revise the schedule for the 1965 assessment. The schedule was revised in several particulars, including physical depreciation on replacement cost new, at the rate of 1¼ percent for each year age of the structure, and a new Section V was added for economic functional depreciation. Section V directed that credit be given for depreciation at the stated rate of the percent of occupancy as compared to total capacity, to be applied to the depreciated net value after applying the 1¼ percent physical depreciation. The 1965 schedule was carried forward with slight revision into the 1966 schedule, and was also placed in the schedule for 1967. By applying the economic and functional obsolescence factor as contained in the 1965 schedule to the valuation of the appellant's property as found by the state taxing authorities for 1964, to determine justifiable value for that year, the appellant's 1964 assessment would have been reduced and the difference between such amount and the 1964 assessed valuation upon which the tax levy was based, would have produced a tax of the approximate amount for which recovery was sought.

In addition to the evidence that the 1964 schedule was mathematically applied by the Cole firm only on a cost less depreciation basis, there was evidence that the defendant taxing authorities did not consider or apply an economic and functional factor in assessing the appellant's elevator in 1964. Both the 1964 and 1965 schedules were admitted in evidence as appellant's exhibits.

The testimony was also uncontradicted that the 1964 Roberts

schedule was not applied uniformly in all counties throughout the state by the county assessors for that year. The schedule was not used in Wilson, Allen, Logan, Reno, Sumner, Stafford, Kingman, Harvey and Comanche Counties.

Roberts testified for the defendants that he prepared the schedule referred to as the 1964 Roberts schedule; that state schedules were first made up in 1957; that he was aware at the time the 1964 schedule was prepared, of "factors" to be considered in appraising property in Kansas, and that in making up the 1964 schedule he considered all factors applicable to grain elevators, including economic obsolescence.

At the conclusion of the evidence, the district court stated that the case was to be resolved by the answer to one question: "Does the failure to include a schedule of economic obsolescence in the schedule for grain elevators for the year 1964 constitute constructive fraud?"

The court then made findings; those pertinent are summarized and quoted: The court specifically found that adherence to the directives of the State Property Valuation Department by the local taxing authorities,

".  .  .  *could not be construed as constructive fraud in any event, because they are so bound to adhere by many statutes; and the State Property Valuation Department is obligated to make such directives and issue such instructions to assessors and other taxing authorities.*

"Now the evidence in this case discloses that the schedule used by the local taxing authorities, which was promulgated by the State Property Valuation Department, *does not include on its face any reference to obsolescence or functional depreciation; nor does it include on its face any particular reference, as such, to any of the factors contained in Section 79-503.*" (Emphasis supplied.)

"*The Court finds  .  .  .  [i]t is obvious from the schedule, itself, that it contains no instruction to the assessing officer to apply any schedule of economic obsolescence depreciation as do the schedules of 1965 and 1966.*" (Emphasis supplied.)

The court further found:

"It has been the testimony of (Roberts)  .  .  .  who prepared such schedule that he did consider the factor of economic obsolescence in the preparation of such schedule. Curiously, he was not questioned by any Plaintiff in regard to this statement; nor was he called as a witness, though he was in the courtroom throughout the trial, to inquire what factors went into his preparation of such schedule  .  .  ."

And that:

"The Court therefore finds there is no evidence on which to base a finding of constructive fraud. The Court finds for the Defendant in each of the . . . cases and for their costs."

We now take up the legal questions. The appellant contends that the valuation of its property by mathematical application of an inflexible schedule which did not include pertinent statutory factors for assessment was illegal, arbitrary and constituted constructive fraud, for which it is entitled to relief as a matter of law.

In 1963 the Legislature in compliance with its duty to provide a uniform and equal rate of assessment and taxation imposed upon it by Section 1, Article 11 of the Kansas Constitution, enacted House Bill No. 435 which was incorporated in the 1963 Session Laws as Chapter 460. The Act was effective upon publication in the statute book on June 30, 1963. The title of the bill stated it was "An Act relating to taxation, prescribing a uniform and equal rate of assessment of all real and personal property which is subject to general property taxes . . ." Section 1 (now K. S. A. 79-1439) reads:

"From and after January 1, 1964, all real and tangible personal property which is subject to general property taxes shall be assessed uniformly and equally at thirty percent (30%) of its justifiable value, as hereinafter defined and provided."

Section 3 amended G. S. 1949, 79-501 (now K. S. A. 79-501) and provided that all real and personal property shall be assessed at thirty percent (30%) of its justifiable value. As used in the statute, "justifiable value" means "true value" or "fair and reasonable value" for taxation purposes. (*Board of County Commissioners v. Brookover*, 198 Kan. 70, 77, 422 P. 2d 906.)

Section 4 (now K. S. A. 79-503) was a new section and for the first time prescribed the standards for the assessment of real property. The section reads:

"To arrive at the justifiable value of real property the assessor or appraiser shall actually view and inspect the property. The price at which real property would sell at auction, forced sale or any transaction in which personal elements were a factor regarding the sale price shall not be taken into consideration in determining the justifiable value. *In determining the justifiable value of real property, the assessor or appraiser shall consider that value in money arrived at when the following factors or combinations thereof are considered:*

(*a*) The proper classification of lands and improvements;

(*b*) the size thereof;

(*c*) *the effect of location on value;*

(*d*) *depreciation, including physical deterioration or functional, economic or social obsolescence;*

(*e*) cost of reproduction or improvements;

(*f*) productivity;

(*g*) earning capacity as indicated by lease price or by capitalization of net income;

(*h*) rental or reasonable rental values;

(*i*) sale value on open market with due allowance to abnormal and inflationary factors influencing such values;

(*j*) comparison with values of other property of known or recognized value; and

(*k*) valuations of land and improvements on the basis of the foregoing elements and such other elements as may be just and proper." (Emphasis supplied.)

The manifest purpose of the statute was to require uniformity and equality in the mode of assessment of all real property in the state and to benefit and protect the individual taxpayer from a sacrifice of his property by a disregard of its provisions in which his rights might be injuriously affected. It is evident the Legislature intended that from and after January 1, 1964, all real property in every taxing district would be uniformly and equally assessed at thirty percent of its justifiable value in money. (79-501, 79-1406 and 79-1439.) To accomplish that purpose, the Legislature detailed the factors or combinations thereof to be considered by taxing officials in assessing real property and directed they apply the same in determining justifiable value. State and local taxing officials may not ignore the standards prescribed, since the statute clearly requires consideration of the pertinent factors to specific property and of an assessment of specific property in conformity with its provisions. It requires no semantic niceties to conclude that consideration of the pertinent factors is mandatory to determine justifiable value. In 3 Cooley, Taxation, 4th ed., Sec. 1061, p. 2136, it is stated unequivocally if, "the provision is mandatory it must be followed or the assessment will be invalid." See, also 84 C. J. S., Taxation, Sec. 393, p. 756.

The appellant's complaint is not merely that its property was overvalued, but that the overvaluation was the result of an arbitrary assessment made in violation of law. A valid assessment of property is a necessary step preliminary to the levy of a valid tax, and the district court's findings tend to support the appellant's contention. The court correctly interpreted the 1964 Roberts schedule as making no provision for allowance for economic or functional obsolescence

or depreciation or any of the other pertinent statutory factors to determine justifiable value of the appellant's property. The finding was nothing less than that the schedule was unlawful on its face and prevented application of those factors, although the evidence substantiating application of them was clearly warranted by the facts. Moreover, the evidence was undisputed that the defendant taxing officials did not consider or apply those factors in assessing the appellant's property.

The district court concluded that adherence to the Roberts schedule could not be construed as constructive fraud in any event because the local taxing officials were bound to adhere to directives of the director of property valuation by many statutes. The conclusion is erroneous. It would have the effect of permitting the Property Valuation Department to usurp both legislative and judicial functions and amount to a holding that it could by administrative action vitiate the statutory commands of the Legislature. It requires no citation of authority to demonstrate that such is not the law. Obviously, the district court misinterpreted the statutes defining the relationship between the director of property valuations and local assessors.

The director of property valuation has general supervision of the system of taxation throughout the state (79-1402), and has supervision of the Property Valuation Department. (74-2440 and 74-2441.) He is given plenary powers over the administration of the assessment and tax laws of the state to the end that all assessments of property be made relatively just and equitable and at its actual and full cash market value. (74-2441 and 79-1404.) Likewise, he has general supervision and direction over all local assessing and taxing officials in the performance of their duties and is required to direct such officials, under penalty of their removal from office, to uniformly assess all property at its justifiable value. (79-503, 79-1401, 79-1404.) In the performance of his duties, he is authorized to adopt and promulgate rules and regulations relating to the assessment of property (79-1441), and to prosecute local taxing officials for a violation thereof. (79-1405.) He is further directed to render all assistance possible toward uniform assessments within the counties and throughout the state (74-2441), and to that end he is authorized to devise forms and schedules for the assessment of property which detail the technical steps necessary to make an accurate valuation and assessment. In *Cities Service Oil Co. v. Murphy,*

202 Kan. 282, 293, 447 P. 2d 791, it was said that the director of property valuation properly furnished assessment schedules to the county assessor pursuant to 74-2441, and that the county assessor was required to conform to the values in such schedules by which he could more accurately appraise property in his jurisdiction.' See, also, *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, 216, 436 P. 2d 982. Assessment schedules promulgated by the Property Valuation Department must be based upon a consideration of the factors of the statute to provide as nearly as may be a uniform and equal rate of assessment throughout the state, and be so formulated as to enable a competent assessor or appraiser to apply the pertinent factors to specify the property in determining its justifiable value.

The director of property valuation is an administrative official and his decisions in all matters within the scope of his supervisory power, involving administrative judgment and discretion, are conclusive upon subordinate taxing officials. In the exercise of his powers, the director must of necessity interpret the tax laws and such interpretations are *prima facie* binding. However, the power exercised by the director is not judicial, and the question whether assessment schedules promulgated by the Property Valuation Department conform to the statute is a question of law not finally determinable by the director of property valuation. In such a situation, the court is of the opinion a taxpayer may protect his proprietary interest against an erroneous decision of the director and is authorized to have the validity of the assessment schedule, as applied to his property, reviewed on the ground the schedule was erroneous as a matter of law. *Robinson v. Jones,* 119 Kan. 609, 612, 240 Pac. 957; *Beacon Publishing Co. v. Burke,* 143 Kan. 248, 253, 254, 53 P. 2d 888.) The director of property valuation is obligated to instruct local taxing officials to follow the law—not to violate it. (79-1426.)

An assessment of property for taxes must be made in accordance with the provisions of a statute, and it would hardly seem necessary to state that if an assessment schedule failed to direct local taxing officials to consider and apply any pertinent statutory factors in determining justifiable value, the schedule would be erroneous as a matter of law. And if through adherence to that manifestly unlawful schedule, the evidence showed the assessor made a palpably excessive overvaluation of the property to be assessed, such act, although made in good faith, would be illegal and amount

to constructive fraud or the equivalent of fraud on the rights of the taxpayer.

It is the settled law in this jurisdiction that the assessment of property for tax purposes may not be set aside on account of mere errors of judgment on the part of the assessing officials. Courts cannot be called upon, in every instance, to settle differences of opinion between the assessing officer and the property owner with respect to the value of property. Before courts will interfere, the conduct of the assessing officer must be without authority or so arbitrary or unreasonable as to amount to constructive fraud. The rule is merely the specific application of the rule of law that the assessment of property, *when done in accordance with law,* is an administrative function in which courts do not interfere or substitute their judgment for that of the administrative auhority. (*Symns v. Graves,* 65 Kan. 628, 70 Pac. 591; *Board of County Commissioners v. Brookover,* 198 Kan. 70, 422 P. 2d 906; *Mobil Oil Corporation v. McHenry,* supra.) However, where state and local taxing officials do not perform their duties in accordance with law, the issue presented to the court is not the exercise of their administrative judgment, but the legality of their acts. In *City Rly. Co. v. Roberts,* 45 Kan. 360, 25 Pac. 854, it was said that courts have no difficulty with their power and authority where taxing authorities attempt to proceed without statutory authority or contrary to the statutes, and that such matters are rightly within the province of the judiciary. *(Harshberger v. Board of County Commissioners,* 201 Kan. 592, 594, 442 P. 2d 5.) In *Hitch Land & Cattle Co. v. Board of County Commissioners,* 179 Kan. 357, 295 P. 2d 640, it was said:

"Insofar as the argument goes that a court will not give relief against a mere overvaluation, it may be remarked that the rule assumes that proper methods have been followed and the overvaluation, if any, is a matter of the exercise of judgment. In the instant case we have a valuation fixed on a basis which is illegal, arbitrary and discriminatory. Under all of the decisions, a court may grant relief where fraud or conduct equivalent thereto exists or where the action of the taxing officials is illegal, arbitrary and discriminatory." (l. c. 363, 364.)

Likewise, in *Addington v. Board of County Commissioners,* 191 Kan. 528, 382 P. 2d 315, this court recently and cogently stated:

". . . Even though the assessor may have thought he was acting in good faith, his illegal acts in failing to comply with the mandate of the legislature constituted bad faith and constructive fraud . . ." (l. c. 534.)

Except for Roberts' testimony that he "considered" all factors applicable to grain elevators, including economic or functional depreciation, when he prepared the Roberts schedule in 1960, the evidence was uncontradicted he devised the schedule on a cost less depreciation basis, and nothing else. It is difficult to perceive how Roberts could have considered such factors when the statute requiring their consideration was enacted three years after the schedule was adopted. Be that as it may, at the meeting in Wichita Roberts stated he knew conditions had changed in the grain storage industry and that the 1964 schedule needed to be revised to provide an economic or functional depreciation factor. However, he refused to make that adjustment in the schedule, but instead, required the county assessor to use the schedule in making the assessment of the appellant's property. Under such circumstances, it must be said that Roberts' conduct at that time can justify no other conclusion than that of an adopted policy or practice of constructive fraud and discrimination against the appellant and its property.

We do not say that in assessing real property and the improvements thereon, consideration and application of the elements of age, state of repair, location, cost of reproduction or improvements, or any other pertinent statutory factors are or that any one of them is controlling upon the assessor in the exercise of his judgment and discretion in determining what valuation he shall place upon the property assessed. What we do hold is that an assessment, made by an assessor in adherence to an assessment schedule promulgated by the Property Valuation Department which fails to take into consideration any of the pertinent statutory factors prescribed in 79-503 and which in common experience ordinarily determines values, will not be upheld where the evidence substantiating application of the pertinent statutory factors is clearly warranted by the facts. When the statutory factors leading to uniformity in distributing the burdens of taxation have been lost sight of or willfully abandoned in promulgating a schedule upon which an assessment is made, the mere assertion of the official who formulated the schedule that he "considered" all pertinent factors, including economic or functional depreciation, when he prepared the schedule, will not avail him in the presence of the actual and admitted facts supplied from his own lips that he did not do so, nor will his assertion suffice to compel the upholding an assessment made in adherence thereto by an assessor, when the evidence shows the assess-

ment resulted in a gross overvaluation of the property assessed. Such an assessment will be invalidated at the instance of a property owner who pursues the proper statutory method to recover the taxes thus improperly imposed.

In view of the conclusion just announced, it is unnecessary to discuss and decide the appellant's contention that the use of the Roberts schedule deprived it of the equal protection of the law in violation of the Fourteenth Amendment to the Constitution of the United States.

We are of the opinion the appellant has clearly sustained the burden of proof that the assessment of its property was made in violation of 79-503 and is entitled to have judgment entered in its favor in accordance with the views herein expressed and in accordance with the provisions of 79-2005.

It is so ordered.

KAUL, J., concurring: I concur in the court's disposition of this appeal. However, I would emphasize my reasoning in reaching the determination. Roberts testified, as found by the trial court, that he considered economic or functional obsolescence in promulgating the 1964 schedule. Whether he did or not is irrelevant to the disposition of this case, because the schedule makes no provision for such allowance. Hence, the county assessor was not directed to apply the factor in assessing appellants' properties and as a practical matter was prevented from so doing by reason of the omission of the factor from the schedule.

The result is a clear violation of the mandate of K. S. A. 79-503(*d*), arbitrary *per se* and constitutes constructive fraud.

The court's reversal of the judgment is eminently correct.

SCHROEDER, J., dissenting: It is inconceivable to me the legislature intended by the provisions of K. S. A. 79-503 (now appearing as K. S. A. 1968 Supp. 79-503, as amended in 1965) to convert the ad valorem tax law of Kansas into an indirect form of income tax. Essentially, this is the effect of the court's decision. The generalities in which the court's opinion is written fail to disclose the pandora's box it has opened, or the havoc it will cause in the administration of the state ad valorem tax law by requiring the reappraisal of most income producing real property of the state each year to assure uniform and equal taxation throughout the state.

Basically the appeal of these consolidated cases calls for a construction of K. S. A. 79-501 and 79-503, which first became effective January 1, 1964. The amendment to 79-503, *supra*, made by the legislature in 1965, on the issue presented by this appeal, is immaterial and further reference to the amendment will not be made in this opinion.

Actually the issue presented by this appeal is quite narrow—what is the meaning of "depreciation, including physical deterioration or functional, economic or social obsolescence" used in K. S. A. 79-503 (*d*)? This is one of the factors enumerated by the legislature to be considered by the assessor or appraiser to determine the justifiable value of real property under the statute.

The trial court hit the nail directly on the head when it said:

"This case may well be resolved down to the one question, and that is, or that question, rather, may be stated as: Does the failure to include a schedule of economic obsolescence in the schedule for grain elevators for the year 1964 constitute constructive fraud?"

In view of the court's opinion, which takes a shotgun approach to the construction of K. S. A. 79-503, far beyond the issues presented by the record, an effort will be made to disclose portions of the record in sufficient detail to show the limited scope of the issue presented by these appeals. (As was done in the court's opinion, further discussion will be confined to the Wallingford case.)

The issues presented to the trial court *were specifically limited by its pretrial order.* This order reads in part:

"It was ordered that the plaintiffs are contending two factual issues: (1) that the assessed valuation of the property concerned was not properly arrived at; (2) that the percentage of fair market or justifiable value used at levying the tax was not equally or properly arrived at. In this connection it is contended generally that the County average of percentage was twenty-six (26) whereas the properties concerned were taxed at thirty (30) percent of fair market or justifiable value.

". . . It was ordered that the above issues are the only issues generally remaining for trial unless they should be modified at the next pre-trial conference. These issues may not be extended except by leave of Court."

The record discloses no other pretrial conference or order, and no evidence whatever was presented on the second point set forth in the order. In fact the contention on the second point appears to concede the property in question was appraised at 30% of justifiable value. There was no order of the court extending the issues

and the matter as thus presented to the trial court was confined to the first issue set forth in the pretrial order.

On appeal herein *it is only the "Roberts Schedule" as applied in the tax year 1964 that is under attack.* This schedule was introduced through witnesses called by Wallingford as "Wallingford Exhibit 26." Nowhere does the court review what this exhibit purports to disclose. The court merely refers to the "Roberts Schedule" as the appellant's witnesses have labeled it *in their testimony.*

"Wallingford Exhibit 26" pertains to *bondable grain elevators.* Schedule I in "Wallingford Exhibit 26" is to be applied to such elevators *with storage capacity under one million bushels.* It sets up the assessed valuation to be used per bushel storage capacity, among other things, as follows:

"Over 100,000 bu. but not over 400,000 bu.— $25,000 plus 15¢ per bu. of Excess Over 100,000 bu.

"Over 400,000 bu. but not over 600,000 bu.—$70,000 plus 12¢ per bu. of Excess Over 400,000 bu.

"Over 600,000 bu. but not over 1,000,000 bu.—$94,000 plus 10¢ per bu. of Excess Over 600,000 bu.

"The above schedule includes all machinery in the elevator proper. Large hopper scales, wagon scales, grain dryers, flat storage, office and additional buildings are to be added."

Schedule II in "Wallingford Exhibit 26" pertains to *grain elevator terminals and grain elevators having storage capacity of over one million bushels.* The assessed values to be used in this connection are as follows:

"Jack Leg Lift:
    $5,000 each complete
"Headhouse:
    $150.00 per foot $\times$ height of headhouse—basement floor to top
    Operating and rated capacity of all legs $\times$ $1.00 (10 hours $\times$ 10¢)
    Bushel capacity of all bins in headhouse $\times$ 10¢
"Upright Storage Tubes:
    Total storage capacity *(Sloping Bottom)* $\times$ *10¢ per bu.*
    Total storage capacity *(Flat Bottom)* $\times$ *9¢ per bu.*
"Scales, grain dryers, flat storage, tank storage, office and additional buildings, aeration systems, etc. are to be added." (Emphasis added.)

Schedule III in "Wallingford Exhibit 26" sets forth various items and the amounts for which they are to be assessed, including flat storage buildings (ranging from 4 to 6¢ per bushel storage); hopper scales; enclosed auger type conveyors, belt conveyors; and other

machinery and equipment used in connection with grain storage elevators and terminals.

At the end of Schedule III in "Wallingford Exhibit 26" appears an item for depreciation as follows:

*"Depreciation: Depreciation allowed on all items per grain elevator schedule 1% per annum. Do not depreciate below 40% of original value."* (Emphasis added.)

For the tax year 1965 the Director of Property Valuation added two schedules to the "Roberts Schedule" used for the year 1964. These two schedules read as follows:

"Schedule IV

*Physical Depreciation*

For the 1965 assessment year, normal physical depreciation will be allowed *on the 1965 replacement cost new,* at the rate of 1¼% for each years age of the structure.

*The maximum depreciation is not to exceed 70%. The structure is not to be depreciated below 30% of the replacement cost new.*

---

Schedule V

*Economic—Functional Depreciation*
*(Desirability—Usefulness)*

To be applied to the depreciated net value after applying Schedule IV
Per cent filled—(Average of Past 2 years) compared to capacity

| 100/90 | 89/80 | 79/70 | 69/60 | 59/50 | 49/40 | 39/30 | 29/20 | 19/0 |
|--------|-------|-------|-------|-------|-------|-------|-------|------|

Per cent of credit

| — | 3% | 9% | 15% | 23% | 30% | 40% | 50% | 60%" |
|---|----|----|-----|-----|-----|-----|-----|------|

(Emphasis added.)

This entire lawsuit hinged on Schedule V as above quoted, which was first authorized for use by the Director of Property Valuation of the state of Kansas in 1965, and, in my opinion, *is nothing less than the writing of a new ad valorem tax law* by the Director of Property Valuation. As such it is *illegal.* This schedule, referred to in the court's opinion as "the economic and functional obsolescence factor," (p. 7) is acceptable to the appellant and gives it cause to rejoice. *Because this schedule was authorized for use in the tax year 1965, the appellant seeks to recover taxes paid under protest for the tax year 1964 on the ground that Schedule V was not authorized for use in determining the assessed valuation in the tax year 1964.*

Particular attention is invited to the heading of Schedule V— "Economic—Functional Depreciation (Desirability—Usefulness)."

Now, when the court in its opinion speaks of "the economic and functional obsolescence factor," *it has adopted the definition as-*

*serted by the appellant in its brief without attempting in any way to construe the meaning of "depreciation, including physical deterioration or functional, economic or social obsolescence," used in 79-503 (d), supra.*

What does the appellant mean by "economic obsolescence?"

The appellant simply means applying Schedule V *to reduce the justifiable value* of its grain storage facility *by an additional amount, after deducting depreciation "on the 1965 replacement cost new," to reflect the income produced by its grain storage facility for the year in question.*

Applying Schedule V, the owner of a grain storage elevator, which is filled to less than 20% of its grain capacity for two successive years, *is entitled to deduct 60% from the depreciated net value of the facility, after applying the "Roberts Schedule" and taking 1½% depreciation "on the 1965 replacement cost new" for each year's age of the structure, to arrive at the justifiable value of the grain storage facility.*

Thereafter, should the grain storage elevator be filled to capacity, the assessed valuation for tax purposes would be increased, and if it were filled to 90% of capacity or more for a second succeeding year, no deduction whatever would be available for "the economic and functional obsolescence factor."

This has never been the definition of economic or functional obsolescence established by the great body of tax law in this country, as I shall later disclose, or as the term "obsolescence" is used in accounting practices.

The record discloses the appellant called five witnesses as follows:

L. J. Holgerson—general manager and vice president of Sam P. Wallingford, Inc.; who supervised the grain department of Wallingford which consisted of buying, selling, handling, storing and traffic, rail traffic, financing and accounting of the business;

John M. Cranor—who is a resident of Hutchinson and is executive vice president of the Kansas Grain and Feed Dealers' Association;

Hal Ross—in the grain storage and flour milling business in Wichita, and since 1952 with the Wichita Terminal Elevator Company as an officer and manager of that company supervising grain storage, traffic matters, grain merchandising, warehouse receipts and various activities associated with the grain storage business and tax problems for the Wichita Terminal Elevator;

Rueben Lehman—employed with Garvey Grain, Inc. as secretary-treasurer; and

Herman Oakes—an independent real estate appraiser qualified as a specialist in appraising grain elevators and storage facilities.

The appellees called three witnesses:

Francis R. Roberts—a resident of Topeka, working for the state of Kansas as supervisor of field services for the Property Valuation Department, to whom the "Roberts Schedule" is attributed;

Fred H. Dengler—a resident of Omaha, Nebraska, and an appraiser for Cole-Layer & Trumble who supervised the assessment of grain elevators for the year 1964 in Sedgwick County, Kansas, for the county assessor; and

Betty Howard—a deputy county clerk in the assessor's office in Sedgwick County, Kansas.

It was the concern of the appellants in these consolidated cases over the assessment of their grain storage facilities in the year 1964 that was instrumental in bringing about the adoption of Schedule V, authorized for use in determining justifiable value for the year 1965. Cranor testified:

".  .  . The first meeting I attended was about the middle of August, 1964, which was the first time we met with Mr. Roberts and Mr. Jones and representatives of the County Clerk's Association in Topeka. Mr. Roberts was present. At that time the industry realized that it could no longer pay any luxury tax that they were paying and that they had to start looking at how they could cut corners on their expenses because the income was not only on the decline but they could see it would decline faster. We went to the Property Valuation people to express our concern about the problems and to try to work out some sort of an equitable solution. We asked them to give us some sort of an economic factor that we could apply so we could come in with a more realistic value. Mr. Roberts stated that they realized they had a sick industry and they wanted to work with us. *We discussed various factors involved such as depreciation and location factors, but we eventually determined to attack the problem that seemed to be most common to all of the firms in the state at that time, and this was occupancy. That was one of the big items we fought for and worked to resolve.*

".  .  . We tried to get a 2½% depreciation on machinery, but their proposal came back with the 1%. *They did buy the economic and functional factor roughly the way we presented it* and discussed it at the first meeting in Topeka *so our group felt this was acceptable because it had a direct bearing on the ability of the property to earn income. .  .  ."* (Emphasis added.)

Holgerson testified as to the meaning of the term "occupancy" as used by the witnesses as follows:

"Q. Is there any way to determine from the Roberts Schedule the effect that occupancy would have upon the fair market value of the property?

"A. Not on Exhibit 26.

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. What do we mean when we use the word 'occupancy' in the grain business?

"A. It's a percent of grain which we have on hand as compared with your total capacity.

"Q. And is occupancy an important element or an important factor in the grain business?

"A. *It's a determining factor of your revenue.*

"Q. Does it have any bearing at all on the fair market value of elevators?

"A. Yes.

"Q. In what way?

"A. Any buyer wants to know what percent of stored grain you had in your elevator *to know whether you had any income."* (Emphasis added.)

Ross testified:

".   .   . We first met with him on August 12, 1964, at Topeka and we had other meetings at various dates after that. We did have an earlier meeting with Mr. Roberts on April 10, 1964, at Wichita. This was merely a meeting of grain elevator operators in Sedgwick County who met with Mr. Roberts and with Cole-Layer-Trumble and with the local county assessor. The purpose of that meeting was to seek some changes in the January 1, 1964, tax assessments which we had all just received. It had been made on the basis of the Roberts Schedule which we had never used previously in Sedgwick County."

Ross further testified that in the meeting on April 10 they talked over putting in an economic functional depreciation factor, but that Roberts declined to do it until the next year. He testified:

"I talked to Mr. Roberts a number of times about the 1964 schedule and he went into detail telling me how he devised the schedule. .   .   . I am almost sure that the conversation concerning the theory on which the schedule was devised took place on August 12, 1964, at Topeka.

.   .   .   .   .   .   .   .   .   .   .   .   .

".   .   . in 1965, for the first time, the economic factor was included, and it was included by saying this: that—

"Depreciation was changed in the 1965 schedule from 1% to 1¼% and the maximum depreciation allowed was changed from 60% to 70% so that you could depreciate down to 30% of value. .   .   ."

On cross examination Ross testified:

".   .   . *The big change, of course occurred in, from '64 to '65, with the insertion of the economic functional factor in the schedule, and that factor could be applied under changed conditions.* In other words, it's so that if it's 20 percent filled, the schedule tells you what the depreciation, economic functional depreciation should be. If the condition of occupancy changed

the next year and it was 10 percent filled, the schedule tells you at 10 percent occupancy what the functional depreciation should be. So, therefore, it permits it to be used in any year under any condition. That was the importance of economic functional factor; it could be applied over a number of changed conditions without changing the schedule itself." (Emphasis added.)

Ross admitted on cross examination:

"I discussed with him [Roberts] in detail the '65 and '66, schedules, but not the '64."

The only testimony in the record that the "Roberts Schedule" used for the year 1964 "was nothing more than a cost less depreciation schedule" was made by the appellant's witnesses. The admissions which the court in its opinion attributes to Roberts—that the "Roberts Schedule" is nothing more than a cost less depreciation schedule—are nothing more than hearsay statements on the part of witnesses for the appellant attributed to Roberts. While these hearsay statements were admissible in evidence as admissions, *they were nevertheless subject to the credibility test by the trial court* and are not binding on Roberts or the Property Valuation Department *as stated in the court's opinion, except insofar as the trial court may have given credence to the testimony of the appellant's witnesses. This the trial court refused to do as indicated by its findings.

Roberts' testimony before the court was very brief. He was called as a witness for the appellees and admitted he was instrumental in making up the schedules which have been referred to as the "Roberts Schedule" used in 1964. He testified:

". . . *In making up these schedules I was aware at the time they were being made up of factors which must be considered in appraising property in the State of Kansas. I considered all factors applicable to grain elevators. I considered economic obsolescence in making up the schedules.* The State schedules were first made up in 1957 and were used specifically in Sedgwick County in 1962 or 1963 from there on. . . .

"*Wallingford Exhibit 26 which has been called the Roberts schedule is the document which I was instrumental in preparing and in preparing this document I did consider economic obsolescence.*" (Emphasis added.)

The *appellant declined to cross examine Roberts* as the trial court noted. The trial court found, among other things:

"Now the evidence in this case discloses that the schedule used by the local taxing authorities, which was promulgated by the State Property Valuation Department, does not include *on its face* any reference to obsolescence or

functional depreciation; nor does it include *on its face* any particular reference, as such, to any of the factors contained in Section 79-503.

"It has been the testimony of some witnesses, two I believe, that the factor of economic obsolescence was not considered by the Defendant in the 1964 assessment, in addition to introduction of the exhibit which was a schedule.

"It has been the testimony of the Field Director of the State Property Valuation Department who prepared such schedule that he did consider the factor of economic obsolescence in the preparation of such schedule. Curiously, he was not questioned by any Plaintiff in regard to this statement; nor was he called as a witness, though he was in the courtroom throughout the trial, to inquire what factors went into his preparation of such schedule. *His schedule was introduced into evidence, but he, himself, was not questioned by any of the claimant Plaintiffs on this most strategic allegation.* And at one time during the trial, objection was made and sustained that it would be difficult to ask another witness to testify as to what factors the author of the schedule might have considered.

"The Court finds there is a distinct difference between considering a factor and using a factor in preparation of a schedule. It is obvious from the schedule, itself, that it contains no instruction to the assessing officer to apply any schedule of economic obsolescence depreciation *as do the schedules of 1965 and 1966.*

"*The fact,* however, in the view of this Court, that *the State Property Valuation Department through the Defendants in this case, taxing authorities of Sedgwick County, did see fit to incorporate a subschedule of economic obsolescence within their general schedule applicable to grain elevators for the years 1965 and 1966 does not in and of itself constitute constructive fraud for the reason that they did not do so prior thereto;* and that in essence is all this case amounts to.

"The Court therefore finds there is no evidence on which to base a finding of constructive fraud. The Court finds for the Defendant in each of the nine cases and for their costs." (Emphasis added.)

Basically the trial court found against the appellant on the only fact issue before it—whether the assessed valuation of the appellant's property was properly determined under K. S. A. 79-503, thereby indicating the taxing officials of Sedgwick County properly gave consideration to the applicable factors to be used in determining the justifiable value of the appellant's property. Its conclusion that there is no evidence upon which to base a finding of constructive fraud is supported by the record.

At the close of the appellant's evidence the appellees moved the trial court for judgment on the appellant's evidence for each of the three tax years for which it paid taxes under protest—1964, 1965 and 1966. The trial court reserved its ruling and at the conclusion of the case sustained the appellees' motion with respect to tax years

1965 and 1966. *The appellant, being satisfied, took no appeal from this order.* Thus, for the purpose of this record, it established the appellant was satisfied with the application of the "Roberts Schedule" as modified in 1965 and 1966 by the addition of Schedules IV and V.

The appellant has attempted to mislead the court by a resort to the use of red herring. One is the appellant's effort to show the "Roberts Schedule" was not used in some of the other counties in Kansas for the year 1964 for the assessment of grain storage elevator facilities. Actually the trial court sustained most of the objections leveled at such testimony on the ground that it was immaterial to the issue as to whether the assessing officials of Sedgwick County were guilty of constructive fraud. What evidence remains in the record is inconclusive and at best second rate. It took the form of summary statements by several of the appellant's witnesses that certain named counties did not use the "Roberts Schedule." Whether other counties assessed grain storage elevators or terminals by legal or illegal methods is immaterial in this lawsuit.

Another red herring is the appellant's attempt to impress the court that "location" is an element in this case to determine the value of its grain storage facility. It is true location is a factor to be considered under the statute (K. S. A. 79-503 [c]), but the appellant's efforts to show failure to give this factor adequate consideration in the "Roberts Schedule" resulted in or contributed to constructive fraud in making the assessment in question by Sedgwick County officials, on the record here presented, are utterly unavailing.

The appellant's own expert witness, Oakes, on the valuation of grain storage elevators and terminals testified:

*"The final results of my appraisal do not show all factors that were considered. When you end an appraisal you end up with a conclusion and you don't show everything you considered.* In making the 1964 appraisal, I looked at the Wallingford property sometime before November, i. e., September or October, 1965. I knew its condition generally as of January 1, 1964. I had some personal knowledge of this elevator. I had formerly talked with Mr. Wallingford and got permission to look his elevator over as comparison with other large storage facilities. I had actually seen the elevator previous to this and I drove by it several times a week since I live north. I work over in that area at various times close to it. The comparable sales I used as [at] the Seaboard Grain was in 1965, the other Seaboard sale to C. F. & G. was in May, 1965, and the Fisher sale was also in 1965. The American Grain was 1965. My appraisal in November of 1965 took in sales which were not available.

*If I would have had to have made this appraisal as of January 1, 1964, I very possibly would have ended up with a different figure. . . ."* (Emphasis added.)

Oakes testified that when the market value is checked there is a vast difference between locations of terminal elevators on water and a facility that is landlocked. This, however, was not disclosed by the record to have been pursued as a significant factor in assessing the appellant's property in the year 1964.

Oakes testified in referring to his study of previous sales of grain storage facilities as follows:

". . . What I did was pick out what I considered the most comparable and have the most effect on value. I have probably close to 100 sales in here of various types of elevators from which this was made up. I go through my list and pick out the most comparable ones in a report. I don't list all of the sales. I did give more weight to certain factors than to other factors. I always give more weight to the market data. *In the absence of market data I would fall back on cost less depreciation.* I made a market value appraisal on the Wallingford property and the Garvey property. *In using cost less depreciation method you are subject to individual opinion on various types of depreciation so it is subject to a certain amount of error.* I felt that the capitalization of income method was not as accurate a method to use as the ones I used. *I did not consider productivity because I do not believe it applied to elevators."* (Emphasis added.)

In referring to the factors enumerated by the legislature in 79-503, *supra,* to arrive at the justifiable value of real property, Oakes testified:

". . . I used all factors which applied. There are some factors which apparently don't apply. In determining what factors apply and what do not apply does not in my opinion depend on the individual appraisal. It would depend more on the individual type of property. . . ." (Emphasis added.)

Furthermore, efforts made by the appellant to show the amount of tax it was entitled to be refunded were based in part upon exhibits prepared by the appellant (and introduced in evidence) using the "Roberts Schedule" as applied in the tax year 1964, *with one exception—the 1964 valuation was recomputed by using Schedule V* (omitted from the 1964 computation) *which was first authorized in 1965.* Thus, the valuations in these exhibits upon which the appellant relied for its claim for refund were limited to a failure of the assessing officials to consider "the economic and functional obsolescence factor" authorized in Schedule V.

Holgerson testified on cross examination with reference to Wallingford's Exhibit No. 1 admitted in evidence:

". . . I applied the 1965 schedule to the 1964 assessment. I did this in the same manner that the Assessor's office of Sedgwick County would have done it if they would have applied the 1965 schedule to the 1964 figures. . . ."

The appellant's witness, Watts, testified that "Garvey Exhibit No. 3," which was introduced in evidence was prepared on the same basis.

Under these circumstances *the "location" factor* as applied to the justifiable value of the appellant's grain storage facility for the year 1964 *is immaterial to its claim.*

The situation presented, therefore, appears to be one in which the appellants in these consolidated cases, through their respective representatives, were instrumental in getting the Director of Property Valuation in Kansas, through Roberts, to adopt a tax law of their own design by incorporating into the "Roberts Schedule" as it appears in "Wallingford Exhibit 26," Schedules IV and V, first used for the tax year 1965. In my opinion, for the reasons hereafter assigned, the property valuation assessments to be challenged are the 1965 and 1966 assessments, because they applied an illegal formula—one based on Schedule V—"the economic and functional obsolescence factor" as defined by the appellant herein.

What does "functional or economic obsolescence" as used by the legislature in 79-503 (*d*), *supra,* mean? Obsolescence has acquired a well defined legal meaning in tax cases and as applied in accounting practices in the United States.

*Obsolescence* in "A Dictionary for Accountants" (3rd Ed.), by Eric L. Kohler, is defined as:

"The loss in usefulness of an asset, occasioned by the approach to the stage of *economic uselessness through progress of the arts; economic inutility arising from external causes.* Obsolescence refers to disappearing usefulness resulting from invention, change of style, legislation, or other causes having no physical relation to the object affected. *It is distinguished from exhaustion, wear and tear, and deterioration in that these terms refer to a functional loss arising out of a change in physical condition.* Obsolescence may be classified as ordinary obsolescence, or loss due to normal progress or development of industry, and extraordinary obsolescence, or loss due to sudden, unforeseen causes, such as an unheralded new invention, style change, or unanticipated cessation of demand for an article produced. *Ordinary obsolescence is customarily included as a factor in determining depreciation rates to allow for the gradual lessening*

*of service life through factors other than physical wear and tear."* (Emphasis added.)

In a property valuation case dealing with the assessment of real property in New York, the court in *People v. Miller*, 26 N. Y. S. 2d 232 (1941), held that in determining the value of property for taxation, "economic obsolescence" is not to be regarded as an element of "depreciation" apart from and in addition to physical deterioration, as both factors are necessarily interrelated and combine to produce depreciation.

Another New York case dealing with the assessment of real property is *Piazza v. Town Assessor of Town of Porter*, 228 N. Y. S. 2d 397, 16 A. D. 2d 863 (1962). It dealt with the definitions of functional and economic obsolescence. It said *"functional obsolescence" with respect to valuation of property for taxation is loss of value brought about by the failure or inability to deliver full service,* and includes any loss of value by reason of *shortcomings or undesirable features contained within the property itself* and is a loss of utility and failure to function due to inadequacies of design and deficiencies in the property. The court said *"economic obsolescence" with respect to valuation of property for taxation is a loss of value brought about by conditions that environ a structure* such as a declining location or down-grading of a neighborhood resulting in reduced business volume.

In *People v. Fitzgerald*, 166 Misc. 237, 2 N. Y. S. 2d 290 (1937), the court was confronted with the assessment of a manufacturing corporation's property by a village. In the opinion the court said:

"Obsolescence, which is one form of depreciation, affects value and should be given due consideration by assessors. 'The word [depreciation] means, by derivation and common usage, a "fall in value; reduction of worth." ' New York Life Ins. Co. v. Anderson, 2 Cir., 263 F. 527, at page 529. It includes obsolescence. Nashville, C. & St. L. Ry. Co. v. U. S., 6 Cir. 269 F. 351, at page 355; San Francisco & P. S. S. Co. v. Scott, D. C., 253 F. 854, at page 855." (pp. 295, 296.)

In *Southeastern Bldg. Corp. v. Commissioner of Int. Rev.*, 148 F. 2d 879 (5th Cir. 1945), it was said:

". . . It thus becomes apparent that while the rental value of the property fluctuated, its life is in no wise diminished, *and to grant taxpayer the relief it here seeks would be the equivalent of aiding it to recoup fluctuation losses.* Manifestly, the life of the property has many years to run, and it can be used throughout its normal life. *The unprofitable nature of a business or the mere shrinkage in value of commodities is not a sufficient basis upon which*

*to predicate an allowance for obsolescence.* . . ." (p. 880.) (Emphasis added.)

The foregoing definitions and authorities on "depreciation," "economic obsolescence" and "functional obsolescence," which apply to the valuation of real property for taxation purposes, show the extent to which the Property Valuation Department of Kansas has been misled in adopting and authorizing the use of Schedule V in 1965 and subsequent tax years to determine the justifiable value of grain elevator terminals and grain elevators.

In my opinion, the legislature intended the meaning of "economic obsolescence," and "functional obsolescence," as used in 79-503 (*d*), *supra,* to be substantially in accord with the definition of obsolescence quoted from "A Dictionary for Accountants." This definition is consistent with the legal authorities on the subject. It is to be noted the language used by the legislature—"depreciation, including physical deterioration or functional, economic or social obsolescence" —is designed to encompass "functional obsolescence" and "economic obsolescence" as factors within "depreciation." This is consistent with the definitions.

Here the "Roberts Schedule" introduced as "Wallingford Exhibit 26" makes specific allowance for depreciation on its face. It further takes into consideration obsolescence in recognizing the difference between "Flat Bottom" and "Sloping Bottom" upright storage tubes by assigning the more efficient storage tube a 10¢ per bushel valuation and the inferior tube a 9¢ per bushel valuation. Holgerson testified concerning Wallingford's storage facility as follows:

"We have flat bottom bins in almost all of our elevators. This makes it have less value than if it had hopper bottom bins. There is also much more spoilage in flat bottom bins. In the elevator built in 1958, at the present time we have 36,000 bushels of damaged wheat because of flat bottom bins."

The hopper bottom bin is an improvement in the art of storing grain, thus accounting for a degree of obsolescence in the flat bottom bin. Holgerson admitted on cross examination:

". . . I testified concerning flat bottom bins and hopper bins. The schedule does take into consideration whether bins are flat bottoms or hopper. I believe the Assessor did take into consideration the fact that our car dump is 40 feet in length."

Holgerson's testimony was that the automatic car unloader measuring forty feet in length was obsolete because most railroad cars carrying grain now are fifty feet long and have to be unloaded manually.

In this connection Dengler, supervising the assessment of grain elevators for the year 1964 in Sedgwick County for Cole-Layer & Trumble, testified:

". . . On occasion, we would deviate from this schedule. For example, the car dump at the Wallingford elevator we did allow a 2% depreciation based on its basic overall condition and the fact that it no longer met the needs of the trade so to speak in terms of being only 40 feet in length. Generally, however, we used the Roberts schedule."

The foregoing evidence establishes that "economic obsolescence" and "functional obsolescence" to the extent they were applicable by definition were clearly taken into consideration and applied in determining the justifiable value of the Wallingford grain storage facility having a capacity of 12,585,000 bushels, with approximately eight and one-half million bushels of upright concrete storage and the balance in lean-to sheds.

Under the "Roberts Schedule" the upright bins with flat bottoms would be valued at 9¢ per bushel, and the sloping bottoms at 10¢ per bushel. "Wallingford Exhibit 5" discloses the cost per bushel of all elevator storage units for Wallingford. In 1958 there were 2,003,216 bushels of capacity built in Battery "A" for 37.7¢ per bushel; in 1954 there were 2,030,800 bushels of capacity built in Battery "G" for 21.4¢ per bushel; and in 1949 there were 2,096,891 bushels of capacity built in Battery "H" for 21.3¢ per bushel. Other battery units varying from 618,816 bushels to 317,575 bushels ranged in cost from 10.8¢ per bushel to 39.3¢ per bushel.

Holgerson testified that in 1965 Wallingford was trying to sell its grain storage facilities including fifteen country elevators for an overall price of a little over 10¢ per bushel of capacity.

The law applicable herein is adequately covered in *Mobil Oil Corporation v. McHenry,* 200 Kan. 211, 436 P. 2d 982, and the cases cited therein.

The assessment and valuation of property are administrative functions, not judicial ones, and courts will not substitute their judgment for that of the assessing authority in the absence of fraud, corruption or conduct so oppressive, arbitrary or capricious as to amount to fraud. Here the appellant relies on constructive fraud in the valuation of its property to set aside the assessment and recover taxes it has paid under protest. (*Addington v. Board of County Commissioners,* 191 Kan. 528, 382 P. 2d 315.)

On the foregoing evidence supplied by the appellant and the record here presented, can it be said the assessing officials of Sedg-

wick County were guilty of constructive fraud? *Absolutely not!* Accordingly, the trial court's findings were supported by the record and are binding on appeal.

If the decision of the court stands and the legislature does not come to the immediate rescue of taxing officials, the clamor for equalization by many owners of real property held for the production of income, and this includes the owners of all farm lands in the state, will fill the courts with actions to recover taxes paid under protest, for the definition of "the economic and functional obsolescence factor" in K. S. A. 79-503 is definitely established by the court's decision.

The decision of the court is nothing short of declaring the ad valorem tax law an indirect form of income tax, requiring reassessment each year for income producing real property.

It is respectfully submitted the decision of the lower court should be affirmed.

PRICE, C. J. and FROMME, J., join in the foregoing dissent.