No. 60,326

ZINKE & TRUMBO, LTD., *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, MICHAEL LENNEN, KEITH R. HENLEY, and MARGALEE WRIGHT, *Appellees.*

(749 P.2d 21)

Opinion filed January 15, 1988.

*Richard D. Greene,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause and *Roger L. Theis,* of the same firm, was with him on the brief for appellant.

*Shari M. Feist,* assistant general counsel, argued the cause, and *Eva Powers,* acting general counsel, was with her on the brief for appellees Kansas Corporation Commission.

*Tim E. McKee,* of Triplett, Woolf & Garretson, of Wichita, argued the cause and was on the brief for intervenor/appellee Sho-Bar Energy, Inc.

The opinion of the court was delivered by

HERD, J.: This is an appeal from the order of the district court affirming the Basic Proration Order (BPO) of the Kansas Corporation Commission (KCC) pertaining to the Fincham O'Brien-Barby Morrow Gas Field in Meade County.

The facts from which this controversy arose are as follows: In October of 1983, appellant Zinke & Trumbo Ltd., drilled and began production of its O'Brien-Barby 1-32 gas well in the center of the NW/4 NW/4 of Section 32, Township 34S, Range 26W, Meade County. It produced 6.8 mmcf per day open flow from the Morrow sand. Zinke proceeded to develop the field by drilling five more successful wells in the area.

Appellee Sho-Bar Energy, Inc., obtained a lease on Section 30, Township 34S, Range 26W. It drilled Fincham 1-30 on the SE/4 SE/4 SE/4 of Section 30. This location is 330 feet from Sho-Bar's south lease line and the same distance from its east lease line. The strategy displayed was to drill as close to Zinke's 1-32 well as permissible. The strategy was successful. Sho-Bar hit a producing gas well with an open flow rate of 4.5 mmcf per day from the Morrow sand. The Morrow sand at Fincham 1-30 is approximately eleven feet thick. On August 2, 1985, Sho-Bar sandfractured its 1-30 well. Following the fracture treatment, the well's open flow was increased to 25 mmcf per day, an enhancement of deliverability of over five times its natural flow. The experts agreed the fracture treatment would extend toward the area of least resistance, the center of the reservoir which is on the Zinke lease. Thus, Sho-Bar obtained production from Zinke's lease.

To prevent drainage from its lease on Section 31 to Sho-Bar's Fincham 1-30 well on Section 30, Zinke drilled its 4-31 well in the NE/4 NE/4 NE/4 of Section 31, Township 34S, Range 26W, a location 330 feet south of Sho-Bar's lease line. This well has 30 feet of pay in the Morrow sand. Based on standard geological isopach mapping techniques, the thinning rate of the Morrow sand from 30 feet at Zinke's Fincham 4-31 well to 11 feet at Sho-Bar's Fincham 1-30 well indicates the Morrow sand pinches out a short distance north of Sho-Bar's well. The offset well does not compensate for the drainage from Zinke's leases to Sho-Bar's lease as had been intended because the exceptional permeability and porosity of the reservoir permits the gas pressure to equalize rapidly when the wells are shut in. Due to market

conditions, the wells are shut in often. When the gas pressure equalizes over the entire reservoir, it enhances the production in all the wells tapping the reservoir.

Zinke's O'Brien-Barby 1-32 well, Fincham 4-31 well, and Fincham 1-31 well (located in the SE/4 NW/4 of Section 31, Township 34S, Range 26W) and Sho-Bar's Fincham 1-30 well all produce from the Morrow sand in what Zinke calls the O'Brien-Barby Reservoir. Zinke has other wells in the field which it claims produce from separate reservoirs. Sho-Bar disagrees.

On September 17, 1985, Sho-Bar filed application for an order setting well spacing and determining allowables for the Morrow Formation in the portion of Meade County where its Fincham 1-30 well was located. The application requested 160-acre spacing with proration based on the standard 50/50 formula, allocating 50% of the total pool allowable to the adjusted open flow of each well and 50% based upon the acreage attributed to each well.

Zinke challenged the application on the grounds that (1) using the adjusted open flow of the Sho-Bar Fincham 1-30 well ignored the artificially enhanced open flow caused by the sand fracture into the heart of the reservoir located under Zinke's leases from a perimeter location; (2) the application applied to acreage which had no production from the Morrow Formation; (3) 160-acre spacing would cause economic waste when one well was sufficient to drain 640 acres; (4) the application applied to three separate reservoirs; (5) Sho-Bar's proposed formula would result in misallocation of reserves by relying on adjusted open flow of wells and failed to consider the extremely high porosity and permeability of the O'Brien-Barby Reservoir and the thickness of Morrow sand underlying the various leases.

The KCC issued its BPO for this field on March 21, 1986. It granted Sho-Bar's application with 160-acre well spacing on the entire area requested and based proration on the standard 50/50 formula on the assumption there was only one reservoir as a common source of supply.

Zinke moved for rehearing. The motion was denied and an appeal was perfected to the district court. The district court affirmed the KCC's order in total. This appeal followed. We reverse and remand as hereinafter set out in detail.

Let us first look at the powers of the KCC granted by the legislature. K.S.A. 55-701 *et seq.* confers jurisdiction upon the KCC to regulate the production of natural gas in Kansas. The KCC is charged with preventing waste and protecting correlative rights when it finds the "orderly development of and production of natural gas from any common source of supply requires the exercise of its jurisdiction." K.S.A. 1986 Supp. 55-703. See *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 6, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964). "Waste," in addition to its ordinary meaning, also includes economic waste, underground waste, and surface waste. K.S.A. 55-702. The other arm of the regulatory duty imposed on the KCC with regard to production of natural gas is that of protecting correlative rights. This means the KCC has the duty to see that

"each owner or producer in a common source of supply is privileged to produce from that supply only in a manner or amount that will not:

"(A) injure the reservoir to the detriment of others;

"(B) take an undue proportion of the obtainable oil or gas;

"(C) or cause undue drainage between developed leases." K.A.R. 82-3-101(a)(15) (1986 Supp.).

K.S.A. 1986 Supp. 55-703(a) makes specific requirements of the KCC in its regulation of the production of natural gas:

"[T]he commission shall regulate the taking of natural gas from any and all common sources of supply within this state in order to prevent the inequitable or unfair taking of natural gas from a common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of any one common source of supply as against another and in favor of or against any producer in any common source of supply. In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent."

Let us now turn to the scope of appellate review of orders of an administrative body. Judicial review of this case is governed by the Act for Judicial Review and Civil Enforcement of Agency Actions. K.S.A. 77-601 *et seq.* The scope of review is set out in K.S.A. 77-621, which provides:

"(a) Except to the extent that this act or another statute provides otherwise:

"(1) The burden of proving the invalidity of agency action is on the party asserting invalidity; and

"(2) the validity of agency action shall be determined in accordance with the standards of judicial review provided in this section, as applied to the agency action at the time it was taken.

"(b) The court shall make a separate and distinct ruling on each material issue on which the court's decision is based.

"(c) The court shall grant relief only if it determines any one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious.

"(d) In making the foregoing determinations, due account shall be taken by the court of the rule of harmless error."

In *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n,* 239 Kan. 483, 497, 720 P.2d 1063 (1986), we held the Act codified earlier established principles of review. These principles include the rule that an agency's findings are presumed valid on review. In addition, we held in *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975), that the district court may not set aside an agency order merely because such court would have reached a different conclusion if it had been the trier of fact, but only when the evidence shows the KCC's determination "is so wide of the mark as to be outside the realm of fair debate." This would mean the KCC's action was not supported by substantial competent evidence. K.S.A. 77-621(c)(7). In addition to the foregoing, K.S.A. 77-621(c)(8) provides that agency action may be set aside by us if it "is otherwise unreasonable, arbitrary or capricious." This also is a codification of the case law. In *Combined Investment Co. v. Board of Butler County Comm'rs,* 227 Kan. 17, 28, 605 P.2d 533 (1980), we defined "unreasonable" action as action taken with-

out regard to the benefit or harm to all interested parties. An agency's action is "arbitrary and capricious" if it is unreasonable or "without foundation in fact." *Pork Motel, Corp. v. Kansas Dept. of Health & Environment,* 234 Kan. 374, 381, 673 P.2d 1126 (1983).

The legislature also provided administrative bodies with an escape clause by providing that after we consider all named reasons for vacating an agency order, we should give "due account" to the harmless error rule. K.S.A. 77-621(d). In other words, if the agency error did not prejudice the parties, the agency's action should be affirmed. To summarize briefly the scope of appellate review: If KCC action is constitutionally authorized by statute, it is presumed valid on review unless it is not supported by substantial competent evidence and is so wide of its mark as to be outside the realm of fair debate, or is otherwise unreasonable, arbitrary, or capricious and prejudices the parties.

K.A.R. 82-1-232(3) provides "[t]he order shall contain a concise and specific statement of the relevant law and basic facts which persuade the [KCC] in arriving at its decision." Where "the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure," we are authorized to grant relief. K.S.A. 77-621(c)(5).

We have construed the procedural requirements of the KCC to mean that it is not obligated to render its findings of fact in minute detail. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 677, 482 P.2d 1 (1971). However, we require its findings to be specific enough to allow judicial review of the reasonableness of the order. *General Communications System, Inc. v. State Corporation Commission,* 216 Kan. 410, 416, 532 P.2d 1341 (1975); *Central Kansas,* 206 Kan. at 677-78. As an important guard against arbitrary action, we require conclusions of law to be supported by findings of fact for which there is evidence in the record. *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 230-32, 440 P.2d 660 (1968). The United States Supreme Court found findings of fact essential, stating that without this requirement, " '*expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.' " *Burlington Truck Lines v.*

*U.S.,* 371 U.S. 156, 167, 9 L. Ed. 2d 207, 83 S. Ct. 239 (1962) (quoting *New York v. United States,* 342 U.S. 882, 884, 96 L. Ed. 662, 72 S. Ct. 152 [1951] [Douglas, J., dissenting], *reh. denied* 342 U.S. 911 [1952]).

Zinke's first contention is that the BPO fails to protect correlative rights. The KCC ordered proration based on its standard 50/50 formula, under which 50% of the total pool allowable is allocated to individual wells on an acreage basis and 50% on the basis of adjusted open flow, determined as described by K.A.R. 82-3-101(a)(42) (1986 Supp.) and K.A.R. 82-3-303.

The KCC stated:

"The adoption of a formula that will enable each well to currently produce its allowable and ultimately produce approximately that amount of gas underlying the unit upon which is located is the object which the Commission seeks to accomplish by the entry of this order. Many factors are to be considered in the connection of the adoption of a formula, such as acreage, pressure, adjusted open flow, porosity, permeability, thickness of pay, and the areal extent and boundaries of the producing formation. Acreage is one of the most important of these factors and should be one of the factors included in the allowable formula. Pressures, porosity, permeability, thickness of pay and the extent of the producing formation are all taken into consideration and given the proper weight accorded when the adjusted open flow of the well is taken into account. Therefore, a formula that considers acreage and adjusted open flow and gives due value to both, should result in the establishment of a well allowable that will permit each well to currently produce its allowable and to ultimately produce that amount of gas which underlies the lease upon which the well is located."

Zinke maintains the KCC paid only lip service to five of the seven factors required by K.S.A. 1986 Supp. 55-703(a) to be considered by the K.C.C. Zinke declares that listing the factors and saying they "are all taken into consideration" and proper weight accorded is not sufficient when a formula is adopted using only acreage and adjusted open flow. "Lip service to a legislative mandate is not enough." *Angle v. Board of County Commissioners,* 214 Kan. 708, 713, 522 P.2d 347 (1974) (citing *Garvey Grain, Inc. v. MacDonald,* 203 Kan. 1, 14, 453 P.2d 59 [1969]).

Sho-Bar's response is that the KCC is not required to make a specific written finding on each factor. The KCC is only required to "give equitable consideration" to each. K.S.A. 1986 Supp. 55-703(a). By requiring only "equitable consideration," the legislature gave the KCC the flexibility to ultimately give more

weight to some factors than others. Sho-Bar points out that *Angle* involved a tax assessor who admitted he had deliberately *ignored* an element which this court had held was statutorily required to be considered.

Zinke contends the evidence shows an open flow rate will not reflect all the mandated factors. Zinke proposed the KCC adopt a proration formula based on 640-acre spacing with an allowable determined by dividing the net acre feet attributable to each well by the total reservoir acre feet. The KCC explained its refusal to adopt Zinke's proposed formula was because it was dependent "upon the precise calculation of the net acre feet of producing Morrow Reservoir underlying each lease." Sho-Bar replies that Zinke's proposed formula would give *no* consideration to the factors of open flow or pressure.

Zinke contends Sho-Bar's fracturing treatment together with the porosity and permeability of the area, which causes great drainage, are pertinent conditions which should have been considered under "such other factors, conditions and circumstances as may exist in the common source of supply." K.S.A. 1986 Supp. 55-703(a).

In August and September of 1985, Sho-Bar and Zinke each fractured wells in order to stimulate deliverability. Zinke fractured its Fincham 1-31 well with 20,000 gallons of fluid because of its position at the edge of the reservoir where more calcite content, which lowers permeability, is found.

As previously mentioned, Sho-Bar fractured its Fincham 1-30 well using a total volume of 35,590 gallons of water and 86 tons of $CO_2$ with 31,000 pounds of sand, with a resultant increase in flow from 4.5 million cubic feet per day to 25 million cubic feet. Experts for both parties testified a fracture of this size would extend at least 400 feet in the area of least resistance. The center of the reservoir on Zinke's lease is the area of least resistance. Since Sho-Bar's location of Fincham 1-30 is only 330 feet from Zinke's lease line, the fracture obviously penetrated Zinke's lease.

Zinke contends the actual total volume used by Sho-Bar was 58,000 gallons, citing Sho-Bar's exhibit 18 as evidence 86 tons of $CO_2$ were used, and claiming this tonnage must be converted to gallons and added to the total volume. Evidence was presented

that fracture treatments with total volumes of 37,500 gallons to 75,000 gallons could result in fractures of 400 to 1,000 feet. Sho-Bar objects that no evidence was presented as to the actual treatment given the well. However, Sho-Bar's exhibit 18, the "Fracturing Service Treating Report," refutes this testimony.

As noted earlier, after Sho-Bar's fracturing treatment, and shortly after its application to the KCC, Zinke drilled a seventh well, Fincham 4-31, 660 feet away and directly offsetting the Sho-Bar well to prevent drainage between the leases and protect its correlative rights. However, as discussed earlier, the seventh well has not compensated for the drainage caused by Sho-Bar's well because the permeability of the reservoir causes the pressure to quickly equalize during the inevitable market imposed shut-in periods. Sho-Bar's fracture treatment increased the open flow factor more than five times. Zinke claims the increased flow comes from its lease and that the proration formula gives Sho-Bar a tremendous reward for its trespass.

The KCC argues the formula used in this case is very similar to the deliverability test used for the Hugoton Oil Field in *Cities Service Oil Co. v. State Corporation Commission*, 205 Kan. 655, 472 P.2d 257 (1970). The main distinction between the formulas, it states, is that open flow measures capacity against atmospheric pressure while deliverability measures the capacity of a gas well producing into a pipeline. *Cities Service* contested the formula for reasons similar to Zinke's, arguing that the fracturing treatment altered the formation so that its leases would not be able to deliver all the gas actually underlying them. It contended the formula did not give adequate consideration to the factors mandated by K.S.A. 1986 Supp. 55-703, but this court upheld the order. 205 Kan. at 668.

Sho-Bar's geologist admitted he had no knowledge of the permeability and porosity of the reservoir because he relied more heavily on drill stem tests than log analysis in his determination of whether a well should be completed. Sho-Bar's petroleum engineer estimated the permeability to be good (about 50 millidarcies), the porosity to average about 16.62%, and the average pay thickness to be about 16.5 feet.

Zinke's geologist determined permeability in O'Brien-Barby to be 80 to 150 millidarcies and porosity 19% at the reservoir's

center. He concluded Zinke's Fincham 1-31 well and Sho-Bar's 1-30 well lie at the edges of the reservoir. He testified the 50/50 formula would not protect correlative rights because of migration during shut-in periods due to high permeability and Sho-Bar's fracture treatment. He admitted, however, that adoption of Zinke's proposed formula based on net acre feet available to each well divided by the total reservoir acre feet could also result in violation of correlative rights if his interpretation of net pay was not completely accurate.

Sho-Bar points out the KCC found the formula would allow each well to "*ultimately* produce that amount of gas which underlies the lease upon which the well is located," even though production would be inequitable at first. We stated in *Cities Service* that "drainage is inevitable." 205 Kan. at 668. Sho-Bar argues the KCC's finding that the reservoir was not unique and that similar formulas had successfully prevented waste and protected correlative rights showed the KCC believed drainage would ultimately be compensated. Sho-Bar contends the BPO conforms to the statute, which provides the KCC's order must "permit each developed lease to *ultimately* produce approximately the amount of gas underlying the developed lease and currently produce proportionately with other developed leases in the common source of supply without *uncompensated* cognizable drainage between separately-owned, developed leases." (Emphasis supplied.) K.S.A. 1986 Supp. 55-703(a).

Zinke argues this theory presumes migration *from* Sho-Bar's leasehold will be as great as migration *to* its leasehold. This theory is correct only when the amount of gas underlying each leasehold is comparable. But according to Zinke's figures, only 6% of the reservoir underlies Sho-Bar's lease, so the reservoir recharges Sho-Bar's lease to a much greater extent than the rest of the reservoir.

Under the KCC's duty to protect correlative rights to natural gas in a common source of supply, we find evidence of fracture treatment to a well or wells in the common field to be one of the "other factors, conditions, and circumstances" which must be considered in making a proration order. It is particularly important where a well's open flow is 50% of its allowable production. The BPO does not reveal, nor do we find, that the fracture

treatment to Sho-Bar's Fincham 1-30 well was considered by the KCC in making its BPO. We hold the order is thus unreasonable.

Zinke next complains the KCC gave no factual findings in support of its order for 160-acre spacing. Zinke proposes a 640-acre pattern, and charges the 160-acre pattern creates economic waste by forcing unnecessary wells to be drilled. Zinke contends every BPO covering Morrow reservoirs except one is spaced on 640 acres:

1. BPO for Harper Ranch N, Clark County;
2. BPO for the Gentsleer Field;
3. Second Revised BPO for the Mohler Northeast Morrow Sand Gas Pool, Meade County;
4. BPO for the Salley Lower Morrow Gas Pool, Seward County;
5. Revised BPO for the Richfield Gas Field, Morton County.

The one BPO not using 640-acre spacing is the Beachamp South Middle Morrow Gas Pool, Morton and Stanton Counties, which used a 320-acre spacing by agreement of the parties.

Zinke reasons that, as the KCC found the present Morrow Formation not to be "unique" (for purposes of determining formula), it should not be able to give the formation a unique spacing pattern.

Sho-Bar objects to Zinke's inclusion of the first listed reservoir, claiming it was being developed on 160-acre spacing at the time it filed its application.

The KCC notes that Zinke's argument that other Morrow fields are spaced at 640 acres was not made during the agency hearing. The district court was thus unable to consider this evidence. See *White Eagle Oil Co. v. State Corporation Comm.*, 168 Kan. 548, 554, 214 P.2d 337 (1950). Zinke argues the KCC is presumed to know of its own orders.

Administrative decisions are not generally subject to stare decisis. *Coggins v. Public Employee Relations Board*, 2 Kan. App. 2d 416, 420, 581 P.2d 817 *rev. denied* 225 Kan. 843 (1978). The present field was developed on a 160-acre basis by Zinke itself. Zinke has drilled four wells in Section 31-34S-26W alone. (Fincham 1-31, NE/4; Fincham 2-31, SW/4; Fincham 3-31, NW/4; and Fincham 4-31, NE/4.) The area Zinke calls the "O'Brien Barby Reservoir" and estimates to contain only 792.2 net pro-

ductive acres contains five wells, three of which are Zinke's.

We find Zinke's development pattern and its evidence of three reservoirs, only one of which contains 640 acres, inconsistent with its insistence upon 640-acre spacing. The KCC's finding that the production from Morrow sand in this field is not unique is inconsistent with the Commission's spacing order, which distinguishes this Morrow production from other Morrow sand production. If, on remand, it is the KCC's determination that the permeability and porosity in this field is sufficiently different from other Morrow sand gas fields to justify reduction of spacing from 640 acres to 160 acres to prevent waste, a finding to that effect should be made.

Zinke's final objection is to the total acreage covered by the order. The order covered an area containing 3,520 acres. Pursuant to K.S.A. 55-703(a), the KCC has authority to regulate the production of natural gas from a common source of supply. The evidence from the experts of both Sho-Bar and Zinke is that the N/2 of Section 30, Township 34S, Range 26W had no Morrow sand and was separated by a barrier from the rest of the field. Arden Ratzlaff, Sho-Bar's expert, also admitted he had no evidence of any Morrow sand in Section 36, Township 34S, Range 27W. The one producing well in Section 36 is producing from the Mississippi formation.

In addition, Zinke contends three separate reservoirs exist in the Morrow sand lying under the rest of the land covered by the KCC's order. Zinke refers to these as the O'Brien-Barby Reservoir, the Fincham Reservoir, and the Ediger Reservoir. The O'Brien-Barby Reservoir contains one Sho-Bar well, one Clifford well, and three Zinke wells, designated as A, B, C, F, and I on appellant's exhibit 3, a copy of which is attached to this opinion. The Fincham Reservoir, situated just west of the O'Brien-Barby reservoir, contains only a Zinke well designated as D. This small reservoir contains less than 160 surface acres and has only one owner and one lessee. The Ediger Reservoir lies to the southwest of the O'Brien-Barby Reservoir and has three Zinke wells, designated as E, G, and H. Sho-Bar argues one continuous reservoir underlies the entire field.

These arguments are significant because they pertain to the "common source of supply," without which the KCC has no

authority to regulate. The KCC vaguely recognized the conflicting scientific theories and attempted to resolve the conflict by lumping all Morrow sand into one common reservoir, but made no finding that the Morrow sand was a common source of supply. It stated:

"a basic order which prorates all Morrowian gas production from the acreage set forth below will better protect correlative rights, prevent waste and promote orderly development in the field. The Morrow sand underlying the following acreage shall be governed by this basic proration order." (The total 3,520 acres were then described.)

Zinke contends the KCC's order is unlawful because it set out no factual basis and no finding that the acreage was within a "common source of supply" pursuant to K.S.A. 55-703. While the legislature makes a "common source of supply" the basis and the reason for the regulation of the production of natural gas, it has not defined the term. K.A.R. 82-3-101(a)(13) (1986 Supp.) defines it as "each geographic area or horizon definitely separated from any other area or horizon which contains, or appears to contain, a common accumulation of oil, gas or both." Thus we can see that Morrow sand within a geographical area could cover many different common sources of supply. In fact, there is much Morrow sand production in southwest Kansas. No one claims that production is all from one common source of supply. It is also apparent that although a source of supply is under one lease, it does not necessarily suggest a commonality with any other person or entity and thus there is no *common* source of supply.

The KCC argues a cross-section of the area introduced by Sho-Bar indicates all the wells produce from one source. However, Sho-Bar's experts testified they did not know the extent of the reservoir, acknowledged they had not considered any of the additional information provided by wells completed after the Sho-Bar wells, and could provide no isopach representing their theory of the reservoir. On cross-examination, R. Douglas Myers, Sho-Bar's expert petroleum engineer testified:

"Q: Do you have an opinion as to the size and shape of this reservoir?
"A: No. No, I do not. I know it's probably contained within those black lines that I have, but I don't know whether it's oval, egg shaped, or fingers in and out or what.
"Q: I believe you testified that the information you had when you prepared your exhibits was sparse.

"A: It was.

"Q: Would you specify what information you were looking at?

"A: Well, I had some electric logs that Mr. Ratzlaff was kind enough to let me look at, or at least look and see what kind of porosities and water saturations we had. I also had scout cards on all the wells in the area, and that's about it.

"Q: Have you looked at any information after you prepared your exhibits?

"A: Well, I happened to have the information that was submitted by Zinke-Trumbo, yes.

"Q: And you've looked at those logs, then?

"A: I looked at what they gave me, which wasn't—well, they had the cross-section, the logs on the cross-section, which I looked at.

"Q: Did you look at the logs that were delivered to Sho-Bar on all the wells in the area?

"A: No, I didn't look at all of those.

"Q: Is there a reason you didn't look at them?

"A: Well, I'd already made my exhibit up on my reservoir characteristics. I wasn't going to change that. This has been delayed long enough, and it probably wouldn't change it too much."

Mr. Myers then further disclosed his lack of preparation by not knowing the elevations of the Morrow sand formation in each of the wells in the area under consideration. He did not know which wells produced oil and which produced condensate. He did not know the permeability or B.T.U. content of the production from the various wells.

After testifying the porosity averages were about 16.62 percent, Mr. Myers testified as follows:

"Q: And where did that percentage come from?

"A: Electric log interpretation.

"Q: Which electric log or logs?

"A: All that I studied, I say all those I had, I made, all these reservoir data came from those logs.

"Q: We've never specifically mentioned what those logs—

"A: I don't know what I got from—but I only—about four or five. I gave them back to Mr. Ratzlaff. He has them in his file.

"Q: Could you refer to your Exhibit No. 1?

"A: Yes.

"Q: And point out which wells those were on.

"A: Oh, I don't know for sure what we got them on. We surely had them on the Sho-Bar. I know that. I think he had one copy of one on the O'Brien-Barby. I may have had one on the 1-31 well. That may have been about it.

"Q: Then you didn't bother to look at the logs that were supplied after your prepared that?

"A: I already prepared this. I wasn't going to change it after waiting for all this other stuff to finally come in."

Mr. Myers finished his cross-examination testimony with this colloquy:

"Q: Did I understand you to say, Mr. Myers, that you have done no calculations as to what the reserves are in the reservoir that these wells are?
"A: Only on a per acre foot basis.
"Q: Not total?
"A: No, no. I don't know how—don't know how much volume we've got there yet."

Arden Ratzlaff, Sho-Bar's expert geologist, gave the following testimony on direct examination:

"Q: Did you have any information on the Zinke-Trumbo? I think it's called the Fincham 2-31, which would be in the southeast southeast of 36.
"A: No, sir.
"Q: Did you have any information on the Zinke-Trumbo well? I'm not sure I can identify it. Well, 2-31, you say you didn't have. Did you have any on the well in the southeast of the southwest of 31? And I don't know the name of that. It's the Zinke-Trumbo.
"A: It's a 2-31.
"Q: 2-31?
"A: Yeah. I didn't have any information on that well or the 4-31, which is up in the northeast corner of Section 31, at the time I did this work.
"Q: Did you have any information on the Zinke-Trumbo well in the far northwest northwest of 5, which I believe is called the Ediger 1-5?
"A: At the time I did the work, no, sir.
. . . .
"Q: As I understand it, Mr. Ratzlaff, the Exhibit No. 3 submitted by Zinke-Trumbo depicts several separate Morrow reservoir bodies; is that your understanding?
"A: It's my understanding that's what they are trying to depict, yes, sir.
"Q: And it's your view that generally there is one larger reservoir body in the subject area as opposed to two or more distinct, separate pressure systems, isolated reservoir bodies; is that right?
"A: With the information I have and I have had, I thought that, sure, when I did my work.
"Q: Does your opinion still hold as to that, and notwithstanding the information that you have had made available to you subsequent to your exhibits, are you still in the same opinion you were at the time you prepared them?
"A: Some of the information that I seen on Zinke-Trumbo's testimony might lead to something else, but I have no verification of that and, consequently, I would have to stick to what I started with.
"Q: Isn't it substantially a matter of your opinion versus that of the gentleman—of the geologist that has prepared these exhibits for Zinke & Trumbo?
"A: Yes, sir."

On cross-examination Mr. Ratzlaff testified:

"Q: All right. Now, I understand that at the time you initially prepared your exhibits, there was less information available to you than there is today at the hearing?

"A: Uh-huh.

"Q: Have you studied the exhibits and the testimony that has been prefiled by Zinke & Trumbo?

"A: I did.

"Q: If I understand your testimony, referring to Exhibit No. 1—or excuse me, your Exhibit No. 2, your testimony is that all the area to the south of the Morrow sand barrier which is colored pink on the copy I have is one productive communicating Morrow reservoir; is that correct?

"A: Possibly.

"Q: Well, is it your opinion that that is one—one reservoir or is it not?

"A: With the information that I've had, I have no way to refute it or to say it isn't. With what logs I've been able to work with and the information I've received, I think so, yes."

On the other hand, Zinke's expert produced an isopach defining his theory of the extent of the reservoirs and supported it with detailed comparative pressures and liquids, showing the difference in each reservoir.

David Trumbo, Zinke's expert geologist, testified as follows:

"Q: Are you familiar with the geological environment of the area which has been proposed by the applicant to be prorated?

"A: Yes, I have personally observed samples, examined electric logs from all the wells in the area and have examined cores of certain wells in the area.

"Q: Do you agree with the applicant that the subject area should have a proration order entered based upon a 160-acre spacing pattern and an allowable based upon a formula attributing 50% of the total pool allowable to the individual wells on an acreage basis and 50% of the total allowable to the individual wells upon the basis of adjusted open flow.

"A: Absolutely not.

"Q: Why?

"A: In short, for three reasons. First, the proposed area covers an area greatly in excess of the area covered by the reservoir into which the applicant's Fincham 1-30 Well is located. Secondly, the proposed area includes the greater part of three readily demonstrable distinct producing reservoirs. Thirdly, due to the nature of the reservoir, basing an allowable on adjusted open flow is not reasonable. Any formula which includes a factor for adjusted open flow will result in wells being able to produce gas far in excess of the gas actually underlying the lease from which it is producing. I firmly believe that a well drilled into the reservoir in which the applicant's Fincham 1-30 Well is completed (the O'Brien Barby Reservoir as shown on my Exhibit 3) can readily drain 640 acres and the proration order should be based upon the net acre feet of the reservoir underlying each lease, not to exceed 640 acres.

"Q: Would you please elaborate upon these three reasons.

"A: Yes. I believe the starting point is to explain the geologic environment in which the Morrow Formation in the Crooked Creek Prospect area (as Zinke & Trumbo, Ltd. has defined its prospect) and as referred to as the O'Brien-Fincham Morrow Pool in the testimony of Mr. Ratzlaff. The Morrow Formation in this area is presently part of the McKinney Gas Field. It is characterized by a black shale of widely varying thickness at the base, sometimes followed by a limestone unit which is oolitic in part and fossiliferous in part. This grades into a shallow marine sandstone (a shoreline sandstone) which is marked by a tidal flat or logoonal facies at the top. Next is a 10' to 20' fossiliferous limestone which is widely present throughout the area. This limestone is then followed by a 30'[to] 40' dark grey shale which is the upper unit in the Morrow Formation.

"Oil and gas production has been established in the Sandstone Unit throughout the Meade County area. Detailed analysis of this sandstone in the immediate Crooked Creek area is possible through examination of a whole core taken during the drilling of the Zinke & Trumbo, Ltd. Fincham # 4-31 Well (marked as Well 'C' on Exhibit No. 3). The data from this core suggests that the sandstone member of the Morrow Formation in this field is a regressive shoreline sandstone. Please refer to Exhibit No. 1 which is a core analysis prepared by Core Laboratories, Inc. in Tulsa, Oklahoma. In addition, please refer to Exhibit No. 2 which is a letter from Mineralogy, Inc. after examinations of thin sections from this core analysis.

"Q: What does the core analysis show as to the permeability of this reservoir?

"A: The permeability is excellent, being in the range of 80 to 150 millidarcies. Therefore, any well in the reservoir can drain 640 surface acres. Incidentally, the McKinney gas field was originally prorated on 640 acres.

. . . .

"A: The data from this core suggests that the sandstone member of the Morrow Formation in this field is a regressive shoreline sandstone. Shoreline sandstones are typically fine-grained, mature, orthoquartzite, very clean and well sorted with small amounts of calcite cement usually associated with oolitically-coated fossil fragments. Most importantly, they are characterized by horizontally to nearly horizontally laminated bedding with occasional thin silt and clay laminations. The fossils and graduational contact with marine limestones indicate a shallow marine depositional environment.

"Q: You have indicated that there are three distinct producing reservoirs within the area sought to be prorated by applicant. Is structure or stratigraphy more important in obtaining production from these reservoirs?

"A: Stratigraphy is absolutely critical and structure has very little to do with the productive ability of a reservoir. These are stratigraphic trap reservoirs and consequently, accumulation of hydrocarbons is independent of structural position and more dependent upon the presence or absence of porous Morrow sandstone. These reservoirs are shoreline sandstones and are typically lenticular, approximately one mile long, one-quarter to one-half mile wide and trending parallel to shoreline. The sands are deposited by wave generated shoreline currents. In the case of the Crooked Creek area, the shoreline trends northwest to

southeast. The lenticular nature of the shoreline sandstone bodies in the Crooked Creek field is easily demonstrated by the existing subsurface well control, and as determined by me from personal examination of electric logs on all the wells in the area to be spaced and examination of the whole core samples and sidewall core samples of wells drilled by Zinke & Trumbo, Ltd. This interpretation of the geological environment is also supported by reservoir pressure tests and analysis as more particularly described in the testimony of Mr. Crowell.

"Q: Please refer to what has been marked as 'Trumbo Exhibit No. 3' and explain its significance.

"A: Exhibit No. 3 is a net pay isopach map prepared by me which illustrates the areal extend of the O'Brien-Barby reservoir and the thickness as determined through data acquired from the drilling of the wells located therein.

"Q: Are you requesting that this Commission enter a proration order covering only the O'Brien-Barby Reservoir?

"A: Yes, and the acreage covering the O'Brien-Barby Reservoir is considerably different than the acreage sought to be prorated by Sho-Bar.

. . . .

"Q: What is the significance of the difference between the pay thickness between applicant's Fincham No. 1-30 shown as Well 'F' and Zinke & Trumbo, Ltd.'s 4-31 shown as Well 'C' on Exhibit No. 3.

"A: The isopach map shows that there is 30' of thickness in Zinke & Trumbo's Fincham 4-31 Well ('C') and only 11' of thickness in the Sho-Bar Fincham 1-30 ('F') just 660 feet north of the Zinke & Trumbo 4-31. This very dramatic rapid thinning at the margins of the sandstone body is characteristic of shallow marine shoreline sandstone. The rapid thinning is further evidenced by the fact that no Morrow sandstone occurs in the Monsanto-Lion Oil Lida # 1, NE NW SE Section 30-34S-26W (Well 'J' on Exhibit 3), or the Midco Exploration Roger # 1, SE SE NE Section 30-34S-26W (Well 'K' on Exhibit 3). This is further supported by my examination of drill cutting samples from both of the above referenced wells and is confirmed by Exhibit No. 2 of Mr. Ratzlaff.

"Q: Exhibit No. 3 shows that the applicants Fincham 1-30 Well ('F') is very near the edge of the reservoir. Please explain why this is so.

"A: Shoreline sandstones, as we have in the O'Brien-Barby reservoir, have secondary cementation occurring at the edges due to the presence of more fossiliferous materials as the sandstones grade into the adjacent facies. This is quite dramatically demonstrated by the difference in performance of the Sho-Bar Energy Fincham No. 1-30 before and after its fracture treatment. After the fracture treatment, the well's absolute open flow increased dramatically, which demonstrates that it is situated on the edge of the sandstone body. Mr. Crowell will discuss this in more detail in his testimony.

"Q: Would you please explain the significance of Exhibit No. 5?

"A: Exhibit No. 5 is a stratigraphic cross-section showing the thickness of the reservoir as found in the Zinke & Trumbo Fincham No. 4-13 and the Zinke & Trumbo O'Brien-Barby 1-32 and how rapidly it thins toward the Sho-Bar Fincham # 1-30. Exhibit No. 5 was prepared by me prior to receiving the actual log on the Sho-Bar Fincham No. 1-30. The overlay, Exhibit No. 6, is the actual log on

the Fincham No. 1-30 and it shows that the rate of thinning as predicted by Exhibit No. 5 was very accurate. Exhibit No. 7 is a cross-section of the subject wells prepared using the actual log on the Fincham No. 1-30.

"Q: Do you agree with Mr. Ratzlaff's Exhibit 2, which shows that the productive portion of the O'Brien-Barby reservoir terminates north of the Sho-Bar Fincham 1-30 Well.

"A: Yes. However, the reservoir terminates much closer to the Sho-Bar Fincham 1-30 Well than Mr. Ratzlaff's exhibit indicates.

"Q: What is your basis for this statement?

"A: Please refer to my Exhibit 3. The Zinke & Trumbo Fincham 4-31 ('E') has 30' of productive reservoir and is located 330' south of the south line of Section 30. The Sho-Bar Fincham 1-30 ('F') is located 330' north of the south line of Section 30 and has only 11' of productive reservoir. There is only 660' between these two wells, yet the Sho-Bar Well has only one-third as much productive reservoir. Obviously the reservoir is thinning very rapidly in that direction. This rapid thinning is consistent with and is a result of the manner in which this type of shallow marine shoreline sandstone reservoir was originally deposited. Consequently, the reservoir terminates approximately 330' to the north of the Sho-Bar Fincham 1-30 Well.

"Q: Would you please explain your earlier statement that there are three reservoirs wholly or partially covered by the area sought to be prorated by applicant.

"A: Yes. There are three distinct producing reservoirs as shown on Exhibit 3 and they are labeled, the O'Brien-Barby reservoir, containing Wells A, B, C and F, the Fincham reservoir containing Well D and the Ediger reservoir containing Wells E, G and H. The Fincham reservoir is obviously separate and distinct from the O'Brien-Barby reservoir as the Zinke & Trumbo Fincham, 3-31 produces black oil (a sample of which is Exhibit 8) and associated gas from a structurally higher position to the O'Brien-Barby reservoir, which produces gas only and some clear liquid condensate. The structural position of the two reservoirs is shown by the structure map marked Exhibit 4. This map is drawn onto the top of the Morrow Formation. Exhibit 9 is condensate (natural gas liquids) produced from the O'Brien-Barby reservoir. It is clear, high-gravity gas condensate. As this condensate is produced from a lower datum than the oil produced from the Fincham reservoir, there is no doubt that these are separate and distinct sandstone bodies.

"Q: What is the basis for your opinion that the Ediger Reservoir is a separate productive reservoir?

"A: The Ediger reservoir to the south is separate and distinct from the O'Brien-Barby reservoir as it can be demonstrated that its reservoir pressure is substantially different than the reservoir pressure of the sandstone body from the O'Brien-Barby reservoir. Prior to producing the Zinke & Trumbo wells shown as E, H and G from the Ediger reservoir in early June, 1985, shut-in tubing pressures were approximately 1,700 pounds (G-1730, H-1685, E-1692). At the same point in time, shut-in tubing pressure in the O'Brien-Barby reservoir was 1,454 pounds. This is a difference of approximately 250 p.s.i. Obviously, these

reservoirs are not connected. The fact that there is a difference in fluid content that cannot be explained structurally and the pressure differential between the reservoirs is consistent with my interpretation that the depositional environment and geometry of the sandstone reservoirs is that of a shallow marine shoreline sandstone.

"Q: What does an examination of the open-hole log suites for the Sho-Bar Energy Fincham No. 1-30, the Zinke & Trumbo Fincham No. 4-31 and the Zinke & Trumbo O'Brien Barby 1-32 show relative to the porosity and water saturation of the O'Brien-Barby reservoir.

"A: These logs show that the porosity in the O'Brien-Barby reservoir is approximately 18% to 20% with water saturations being 25% to 30%. This data correlates very consistently with the data contained from the whole core analysis taken in the Zinke & Trumbo, Ltd. Fincham No. 4-31, as shown by Exhibit No. 1.

"Q: In your opinion, from which reservoir does the Sho-Bar Fincham 1-30 well produce?

"A: From the O'Brien-Barby reservoir.

. . . .

"Q: In your opinion, should the adjusted open-flow capability of a well be used as a factor for determining an allowable for a well located in the O'Brien-Barby reservoir?

"A: No. Because the O'Brien-Barby reservoir is such that it has tremendous porosity and permeability. This allows a well to produce at very high rates whether or not the lease from which it produces actually has many productive acres or much gas underlying it. If it does not, then it will drain gas from the offset leases where the productive acres and gas reserves are located. Due to the somewhat unique nature of this reservoir, the deliverability or open flow has no relation to the gas underlying the acreage upon which it is located. Consequently, it is my opinion that although the Sho-Bar Fincham No. 1-30 has only 62.1 productive acres that can be attributed to it in the SE Quarter of Section 30-34S-26W, it could, in fact, produce and drain gas from an area greatly in excess of its producing acreage. This will result in the taking of gas from Zinke & Trumbo's Fincham and O'Brien-Barby leases.

"Q: Is it your opinion that one well can adequately and sufficiently drain 640 acres in the O'Brien-Barby reservoir?

"A: Yes."

The testimony of Ronald F. Crowell, Zinke's expert reservoir engineer, was similar in thoroughness and added further support to Zinke's contentions.

The KCC ignored the evidence and adopted the theory that production from Morrow sand is production from a common source of supply, making no findings of fact to support its conclusion. The district court found the Commission's conclusions sufficient to make the KCC's order lawful. Zinke argues on appeal the KCC's failure to make a specific finding that the area

covered by the BPO was a common source of supply makes the order unlawful.

Sho-Bar contends this issue, not having been raised in the district court, is thus not before us on appeal. It is true we have so held. See *Centro Management, Inc. v. Kansas Dept. of Human Resources,* 237 Kan. 369, 374, 699 P.2d 524 (1985). However, here we are presented an issue of jurisdiction, without which the matter dealt with is void *ab initio.* We have held jurisdiction is an issue which can be raised at any stage of the proceeding. *Minter-Wilson Drilling Co. v. Randle,* 234 Kan. 624, 628, 675 P.2d 365 (1984). We hold we may review the jurisdiction of KCC action as we would jurisdiction in other civil cases. See K.S.A. 77-623.

Let us therefore consider whether the KCC has jurisdiction of natural gas regulation in a gas field in the absence of a finding based upon substantial competent evidence that the field is a "common source of supply." K.S.A. 55-701 prohibits waste in the production of natural gas, making no reference to source of supply. K.S.A. 1986 Supp. 55-703(a) authorizes regulation of production of natural gas by the KCC but makes such regulation conditional upon a determination of a "common source of supply" for proration to prevent waste and protect correlative rights. K.S.A. 55-703a authorizes the KCC to regulate well spacing in "any such common source of supply and provide for the orderly development thereof."

The statutes are clear and unambiguous. The KCC's regulatory authority over natural gas is dependent upon a finding there is a common source of supply. We hold the KCC made no such finding and the order is thus unlawful.

Zinke also contends that even had the KCC made a finding that the area covered by the BPO had a common source of supply, the evidence would not have supported such a conclusion.

Let us examine the evidence. It showed the thickness of the Morrow sand varied from 30 feet in Zinke's Fincham 4-31 well and 11 feet in Sho-Bar's Fincham 1-30 well to as little as seven feet in the Clifford-Fincham 1-30 well, all of which are in what Zinke designates as the O'Brien-Barby reservoir, indicating the Clifford well and Sho-Bar's well are on the perimeters of the

reservoir. The "Fincham reservoir," which contains only Zinke's Fincham 3-31, contains 12 feet of Morrow sand. This well produces from a higher elevation and produces black oil while Fincham 1-31, located a short distance east of Fincham 3-31 in the O'Brien-Barby Reservoir, produces clear gas condensate. The "Ediger reservoir" contains the Zinke Fincham 2-31 well with 21 feet of pay, the Zinke Ediger 1-6 well with 25 feet of pay, and the Zinke Ediger 1-5 well with eight feet of pay. There is a pressure difference of 250 p.s.i. between the "O'Brien-Barby reservoir" and the "Ediger reservoir."

Without producing his isopach map, Sho-Bar's expert explained the different scientific factors could be explained by the gas-oil contact in one reservoir being tilted, or by the well in the Fincham Reservoir (Fincham 3-31) being perforated in a lower section of the Morrow sand than the Fincham 1-31 well in the O'Brien-Barby Reservoir.

When we view the record as a whole, we conclude the BPO was unlawful because the KCC failed to find the area covered by its order is one common source of supply and included 960 acres with no productive Morrow sand. The order is unreasonable because it is not supported by substantial competent evidence. We so hold.

The judgment of the trial court is reversed and this case is remanded to the KCC with directions to make findings of fact based on substantial competent evidence consistent with this opinion.

**APPENDIX**

Exhibit 3

ZINKE & TRUMBO, LTD.
111 WEST FIFTH STREET SUITE 220
TULSA, OKLAHOMA 74103

PROPOSED SPACING
CROOKED CREEK AREA
Meade Co   Kansas

ISOPACH
NET MORROW SANDSTONE
>10% POROSITY
C I = 10'

Geologist  D B TRUMBO